POLYCAST TECHNOLOGY CORPORA-
TION and Uniroyal Plastics Acquisi-
tion Corp., Plaintiffs,

v.

UNIROYAL, INC., CDU Holding, Inc., Jo-
seph P. Flannery, John R. Graham, Al-
exander R. Castaldi, Robert Alvine,
Donald L. Nevins, Jr., Alfred Weber,
Clayton & Dubilier, Inc., the Clayton &
Dubilier Private Equity Fund Limited
Partnership, Clayton & Dubilier Asso-
ciates Limited Partnership, Martin H.
Dubilier, Joseph L. Rice III, and Alan
R. Elton, Martin H. Dubilier, Joseph P.
Flannery, John R. Graham, and Joseph
L. Rice III as Trustees of CDU Holding,
Inc. Liquidating Trust, Defendants.

No. 87 Civ. 3297.

United States District Court,
S.D. New York.

May 4, 1992.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Martin London, George P. Felleman, Carey R. Ramos, Walter Rieman, Carol Salem, Jonathan J. Freedman, Elizabeth J. Holland, Laura Farina, of counsel), and Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City (Sidney H. Stein, of counsel), for plaintiffs.

Debevoise & Plimpton, New York City (John H. Hall, Daniel M. Abuhoff, Joseph P. Moodhe; T. Edward Tighe, of counsel), for defendants.

Friedman & Kaplan, New York City (Edward A. Friedman, Andrew W. Goldwater, Eric Seiler, of counsel), for defendant Alfred Weber.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The genesis of this action is the sale and purchase of a corporation. The purchaser repents of its bargain, and seeks to undo it and recover compensatory and punitive damages. Subject matter jurisdiction in this Court is founded upon claims under the federal securities laws and the civil RICO statute, to which state and common law claims are appended. Following extensive discovery, defendants move under Rule 56, Fed.R.Civ.P., for summary judgment dismissing the complaint.

### Background

The action was originally assigned to District Judge Walker (as he then was). Much of the factual background appears in his two prior opinions, reported at [1988–89 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,005, 1988 WL 96586 (S.D.N.Y. Aug. 25, 1988) and 728 F.Supp. 926 (S.D.N.Y.1989), familiarity with which is assumed.

The litigation arises from the allegedly fraudulent sale by defendant Uniroyal, Inc. ("Uniroyal") of its wholly-owned subsidiary Uniroyal Plastics Company, Inc. ("Plastics") to plaintiffs Polycast Technology Corporation ("Polycast") and Uniroyal Plastics Acquisition Corp. ("UPAC"), a company formed by Polycast to consummate the sale. I will refer to the plaintiffs collectively as "Polycast." In substance, Polycast alleges that in valuing and pricing the shares of Plastics and in consummating the transaction, it relied on materially misleading information furnished by defendants with respect to the financial status, earnings potential, and operating condition of Plastics, and that as a result it paid a grossly excessive price for the stock.

Judge Walker's prior opinions dealt with challenges to the legal sufficiency of various pleadings. Since that time the parties have completed extensive discovery. All defendants now move for summary judgment dismissing all of plaintiffs' claims against them.

The operative pleading is plaintiffs' fourth amended complaint (hereinafter the "Complaint"). The defendants are Uniroyal; its parent, CDU Holding, Inc.; six officers of Uniroyal and Plastics; Clayton & Dubilier, Inc., its two principals and related investment entities (the "C & S defendants"); and the trustees of the CDU Holding, Inc. Liquidating Trust.

CDU Holding, Inc. owned all of Uniroyal's common stock from September 24, 1985 to December 2, 1986. CDU Holding,

Inc. Liquidating Trust is the successor in interest to Uniroyal and CDU Holding, Inc.

The trustees of the CDU Holding, Inc. Liquidating Trust are the individual defendants Alan R. Elton, Martin H. Dubilier, Joseph P. Flannery, John R. Graham, and Joseph L. Rice III.

At the pertinent times Flannery was chairman of the board, chief executive officer, and president of Uniroyal, as well as a stockholder. Flannery is also alleged to be a beneficiary of the Liquidating Trust.

Defendant Graham was chief financial officer and a stockholder of Uniroyal, and is a beneficiary of the Liquidating Trust. Defendant Alexander R. Castaldi was vice-president, controller, and a stockholder, and a beneficiary of the Liquidating Trust.

Defendant Elton was vice-president and general counsel of Uniroyal. He is named as a defendant in this action solely in his capacity as a trustee of the Liquidating Trust.

Defendant Robert Alvine was group vice-president of the Engineered Products Group—Worldwide of Uniroyal, a Uniroyal stockholder, and president of Plastics until October 31, 1986. He is a beneficiary of the Liquidating Trust.

Defendant Donald L. Nevins, Jr., was controller of the Engineered Products Group of Uniroyal.

Defendant Alfred Weber was vice-president and the general manager of Plastics until November 1, 1986, a stockholder of Uniroyal, and is a beneficiary of a Liquidating Trust.

The "C & D defendants," as they are collectively referred to in the litigation, consist of Clayton & Dubilier, Inc., the Clayton & Dubilier Private Equity Limited Partnership, the Clayton & Dubilier Associates Limited Partnership, and the individual defendants Dubilier and Rice. The relationship of the C & D defendants to Uniroyal and Plastics came about in this fashion. Confronted with a hostile tender offer in 1985, Uniroyal executed a merger agreement later that year with CDU Acquisition, Inc. and CDU Holding, Inc. A leveraged buyout was consummated through a merger transaction. Following completion of that transaction, all of Uniroyal's common stock was held by CDU Holding, Inc., whose shareholders included Flannery, Graham, and Weber. But the largest beneficial shareholder of CDU Holding, Inc. was the Clayton & Dubilier Private Equity Fund Limited Partnership ("C & D Private Equity"), which held 32.5% of the common stock of CDU Holding, Inc. The general partner of C & D Private Equity was Clayton & Dubilier Associates Limited Partnership ("C & D Associates"). Dubilier and Rice were the general partners of C & D Associates.

At the times pertinent to this litigation, Uniroyal's three-man executive committee consisted of Flannery, Rice and Dubilier.

Defendants Flannery, Graham, Castaldi, Alvine, Clayton & Dubilier, Inc., the Clayton & Dubilier Private Equity Fund Limited Partnership, the Clayton & Associates Limited Partnership, Dubilier and Rice are alleged to have been at the pertinent times controlling persons of Uniroyal and of CDU Holding, Inc. under section 15 of the Securities Act of 1933, 15 U.S.C. § 77o and section 20 of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.

Polycast agreed to purchase Plastics from Uniroyal in a Stock Purchase Agreement (hereinafter "SPA") dated as of July 23, 1986. The transaction closed on October 31, 1986. Plaintiffs now regret that purchase, regard themselves as the victims of fraud, and commenced this action which they summarize in their brief at 2:

> The core of this case is a fraud claim—that defendants deliberately misrepresented what [Plastics] would earn in 1986 and subsequent years and that plaintiffs relied upon those false representations in purchasing Plastics for $110 million.

That core finds expression in nine claims for relief set forth in the complaint, as follows:

The first claim, against all defendants, alleges violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Complaint, ¶¶ 34–148.

The second claim, against all defendants, alleges violation of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l(2). Complaint, ¶¶ 149–159.

The third claim, against the C & D defendants, charges them as principals in violating section 12(2) of the Securities Act. Complaint, ¶¶ 160–161.

The fourth claim, against all defendants, charges violations of the RICO statute, 18 U.S.C. § 1962(c). Complaint, ¶ 162–181.

The fifth claim, against all defendants, alleges common law fraud. Complaint, ¶¶ 182–189.

The sixth claim, against all defendants, alleges negligent misrepresentation. Complaint, ¶¶ 190–195.

The seventh claim, against Uniroyal and the trustees of the Liquidating Trust, alleges breach of warranty. Complaint, ¶¶ 196–202.

The eighth claim, against Uniroyal and the trustees of the Liquidating Trust, is for indemnity. Complaint, ¶¶ 203–208.

The ninth claim, against Uniroyal and the trustees of the Liquidating Trust, is for reformation of the purchase agreement. Complaint, ¶¶ 209–225.

In their prayers for relief, pleaded in the alternative, plaintiffs seek rescission or reformation of the contract, and compensatory and punitive damages, with compensatory damages to be trebled under RICO.

The parties have engaged in extensive discovery. The deposition transcripts and documents produced are voluminous. It is difficult to imagine that trial will give rise to additional evidentiary material of any significance. All defendants now move for summary judgment.

### Discussion

Under Fed.R.Civ.P. 56(c), the moving party is entitled to summary judgment if the papers "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." On such a motion, "a court's responsibility is to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Coach Leatherware Co., Inc. v. Ann Taylor, Inc.*, 933 F.2d 162, 167 (2d Cir.1991) (citing *Knight v. U.S. Fire Insurance*, 804 F.2d 9 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)). The responding party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). "The non-movant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' ... or defeat the motion through 'mere speculation or conjecture.'" *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations omitted). While the party resisting summary judgment must show a dispute of fact, it must also be a material fact in light of the substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). That is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### The Fraud Claims

I will first consider plaintiffs' claims for securities fraud and common law fraud. While defendants' brief discusses plaintiffs' section 12(2) claims under the fraud heading, that is inappropriate given the quite different theory of liability that obtains, and I will discuss the section 12(2) claims separately.

As noted, the "core" of plaintiffs' fraud claim is that defendants deliberately misrepresented "what Plastics would earn in 1986 and subsequent years," namely 1987–1990; and that plaintiffs relied upon those false representations in purchasing Plastics for $110 million.

With respect to Plastics' 1986 earnings, plaintiffs place particular emphasis upon

an earnings forecast of $13.3 million which they allege that Castaldi and Alvine, "in the presence of ... Rice and acting on behalf of all defendants other than Elton," communicated to Polycast's officers at a meeting on September 5, 1986, going on to represent, among other assertions, that this $13.3 million earnings estimate "was a rock bottom number which could be taken to the bank." Complaint at ¶ 112. Particularly relying upon that representation, "plaintiffs decided to submit a revised bid for Plastics." Id. at 114.

The complaint's reference to a "revised bid" requires some review of the events leading up to the purchase, which in significant measure are not disputed.

Plastics was one of several wholly owned subsidiaries of Uniroyal. Uniroyal decided to sell Plastics pursuant to an auction process conducted by Drexel, Burnham, Lambert, Inc. of New York ("Drexel"). Uniroyal and Drexel produced an offering memorandum which Drexel circulated to potential purchasers, including Polycast. The offering memorandum included a projection that Plastic's income for 1986 would be approximately $24 million. Uniroyal delivered the offering memorandum to potential purchasers in March 1986.

In a meeting on May 8, 1986 at Uniroyal's headquarters in Oxford, Connecticut, Alvine, Nevins and Weber met with representatives of Polycast and told them that Uniroyal had lowered its 1986 earnings forecast for Plastics from $24.0 million to $22.5 million. Complaint at ¶ 60.

On June 12, 1986, Uniroyal informed Polycast that Uniroyal had again lowered its 1986 earnings forecast for Plastics, this time from $22.5 million to $20.5 million. Id. at ¶ 67. On June 24, 1986, Uniroyal informed Polycast that Uniroyal now estimated 1986 earnings for Plastics to be $17.6 million. Id. at ¶ 69.

On or about July 23, 1986 Polycast submitted to Uniroyal the winning bid of $134 million to purchase Plastics. The SPA was executed that date. It was accompanied by a disclosure letter in which Uniroyal reiterated a 1986 earnings forecast for Plastics of $17.5 million. Id. at ¶¶ 79–81.

On August 27, 1986, Castaldi, Alvine and Weber informed Polycast that Uniroyal had again lowered its forecast of Plastics' 1986 earnings to approximately $15.5 million. Polycast, in accordance with its rights under the SPA, withdrew its offer to purchase Plastics and terminated the SPA.

This set the stage for the September 5, 1986 meeting, at which the representatives for Uniroyal and Plastics told Polycast of the $13.3 million "rock bottom" 1986 earnings forecast for Plastics. Further negotiations between the parties ensued. Eventually, on September 23, 1986, Polycast agreed to purchase Plastics for $111.6 million. The SPA was amended on that date to reflect the new purchase price and a new closing date. Id. at 122.

The purchase price was reduced one more time following a telephone conversation on October 27, 1986, between Weber and Richard Schneider, Polycast's president. In that conversation Weber acknowledged that Plastics would not achieve its sales forecast for the month of October 1986. Polycast then negotiated a reduction in the purchase price from $111.6 to $110 million. The parties executed a further amendment to the SPA reflecting that reduction. Unlike the prior amendment reducing the purchase price to $111.6 million, the amendment did not refer to or change Uniroyal's previous 1986 earnings forecast for Plastics. The transaction closed on October 31, 1986, at the $110 million purchase price. Id. at ¶ 123.

As for the projections of Plastics' earnings for 1987 through 1990, the complaint alleges at ¶ 72 that on or about July 2, 1986, Donald A. Ware, the assistant corporate controller of Uniroyal, sent to Drexel documents forecasting Plastics' earnings before interest and taxes of $17.6 million during 1986, and forecasts of $20.7 million, $22.7 million, $24.9 million, and $27.0 million for 1987, 1988, 1989, and 1990 respectively. Plaintiffs allege that these forecasts for the later years were based in part on the then-existing $17.6 million forecast for 1986, which defendants knew to be false. Complaint at ¶ 74.

The third specific area of fraud plaintiffs allege concerns a contract Plastics had to supply the Northrop Corporation with fuel cells for the F/A–18 military fighter plane. The presentations made by Uniroyal and Plastics representatives to Polycast projected sales by Plastics to Northrop of these fuel cells. In mid-September 1986, Northrop cancelled its contract with Plastics. Uniroyal and Plastics did not advise Polycast of that cancellation and Polycast did not learn of it until after the closing. Polycast alleges that defendants engaged in the fraudulent non-disclosure of a material fact. Complaint at ¶¶ 106–111.

Plaintiffs place primary emphasis upon the $13.3 million estimate of Plastics' 1986 earnings articulated at the September 5, 1986 meeting. All defendants argue that as a matter of law Polycast cannot establish reliance, cognizable damages or loss causation with respect to that earnings estimate. The C & D defendants also argue that they are entitled to summary judgment on the element of scienter.

The appropriateness of summary judgment depends in part upon the "governing law," *Anderson* at 250, 106 S.Ct. at 2511. The trial judge must "view the evidence through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. at 2513.

In order to establish a claim for securities fraud under section 10(b) of the 1934 Act, a plaintiff must allege and prove "that, in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's actions caused him injury." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir.1985). In federal securities cases the plaintiff's burden of proof is the "preponderance-of-the-evidence standard generally applicable in civil actions." *Herman and MacLean v. Huddelston,* 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). As the Second Circuit observed in *Weinberger v. Kendrick,* 698 F.2d 61, 78 (2d Cir.1982), cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78

L.Ed.2d 89 (1983), "the plaintiff's burden of proof in a common law fraud case—clear and convincing evidence—is more demanding than in a Rule 10b–5 case." (construing New York law).

Defendants at bar acknowledge that the forecasts of Plastics' 1986 earnings were given "in connection with the purchase or sale of securities," namely, the Plastics stock which Polycast bought. Defendants argue, however, that the September 5, 1986 forecast of $13.3 million in 1986 earnings was a forecast, and not a guarantee. Defendants cite Second Circuit authority for the propositions that "[e]conomic prognostication, though faulty, does not, without more, amount to fraud," *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 117 (2d Cir.1982) (quoting *Polin v. Conductron Corp.,* 552 F.2d 797, 805 (8th Cir.), cert. denied, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977)); and "[t]he sole factual elements of a projection should be that it represents management's view, that it was reached in a rational fashion and that it is a sincere view." *Marx v. Computer Sciences Corp.,* 507 F.2d 485, 490 n. 7 (9th Cir.1974). However, as the cases cited by defendants themselves suggest, economic estimates, forecasts or projections are not insulated from claims for fraud if they were put forward in bad faith, with awareness of their inaccuracy, and an intent to deceive. "Liability may follow where management intentionally fosters a mistaken belief concerning a material fact, such as its evaluation of the company's progress and earnings prospects in the current year." *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 164 (2d Cir.1980).

Defendants do not suggest that the $13.3 million earnings forecast was not a material fact in the context of the proposed purchase. There is sufficient evidence to permit a jury to find that a number of Uniroyal and Plastics officers deliberately concocted false earnings forecasts, including the $13.3 million estimate, in order to induce Polycast to purchase Plastics. Defendants argue in their briefs that these charges of falsity and scienter depend solely on the testimony of T. Oliver Kirrane, a

former Plastics officer. In point of fact, there is more evidence in plaintiffs' favor on the issues than that; but even if plaintiffs' case depended entirely upon the testimony of Kirrane, who the jury could find refused to go along with the fraud, his credibility would be for the jury to evaluate.

Sensibly enough, defendants do not press these points. Rather, they focus upon reliance and causation.

◾ Defendants argue that Polycast did not rely on the $13.3 million estimate. They find support for that proposition in disclaimers Polycast included in a private placement memorandum it prepared in October 1986 with a view towards financing its purchase of Plastics. Polycast included in that memorandum the earnings projections provided by Plastics and Uniroyal, and said of them:

The projections are based upon estimates and assumptions about circumstances and events that have not yet taken place, are subject to customary uncertainties inherent in making projections and may be materially affected by changes in circumstances and numerous other variables, many of which are difficult to predict and beyond the control of Polycast and Uniroyal Plastics. Therefore, the actual results achieved will vary from the projections, these variation may be material and there can be no assurance that the projected results will be attained.

Secondly, defendants rely upon communications between Uniroyal and Plastics on the one hand and Polycast on the other between September 5, 1986 and the October 31, 1986 closing. Fulfillment of the $13.3 million estimated earnings during 1986 depended in part upon Plastics' earnings during September and October 1986. Defendants point to the allegation in ¶ 123 of the complaint that "[i]n response to repeated inquiries from plaintiffs, during October 1986 Uniroyal disclosed to plaintiffs certain preliminary financial information purporting to record business activity at Plastics during September 1986", which "suggested that Plastics had not met certain financial targets for September." De-

fendants in their main brief at 33 omit the next sentence from ¶ 123 of the complaint, which reads: "However, defendants did not withdraw Uniroyal's 1986 earnings forecast for Plastics of $13.3 million and failed to disclose that Plastics' earnings would be materially lower than $13.3 million." That omitted language undermines the effectiveness of any admission that might otherwise be derived from the pleading.

On the reliance issue, defendants stress particularly the telephone conversation on October 27, 1986, between Weber and Schneider. In the October 27, 1986 telephone conversation between Schneider and Weber, Weber told Schneider that Plastics anticipated a shortfall of approximately $2 million in projected sales for October, with a corresponding decline of approximately $760,000 in earnings that month. Weber and Schneider did not discuss the $13.3 million estimate in their October 27 conversation. Schneider became angry. He told Weber that Polycast was paying too much for Plastics and would "take the price down." Weber Dep. at 1782. On October 29, 1986 Polycast demanded and ultimately received a $1.6 million reduction on the purchase price for Plastics: from $111.6 million to $110 million, the figure at which the deal closed on October 31. Polycast advised its potential investors that the reduction in the purchase price resulted from reductions in Plastics' projected earnings.

These facts are for the most part undisputed. The question is whether, as defendants contend, they establish that Polycast did not rely on the $13.3 estimate conveyed on September 5, 1986 in deciding to purchase Plastics at the reduced price of $110 million on October 31. Defendants say that "as a result of information provided by Uniroyal for days before the closing, Polycast did not in fact reply upon the $13.3 million projection." Reply Brief at 5.

The jury could find that Uniroyal and Plastics officers fraudulently concocted the $13.3 million forecast, which bore no resemblance to economic reality, for the express purpose of luring Polycast into going through with the deal. The jury could find this to be a *modus operandi*, infecting and

tainting the prior earning estimates. For example, there is evidence from which the jury could find that in August 1986 Flannery threatened to fire Weber after Weber told Polycast at a meeting that Plastics would earn less than the then existing estimate, and that Flannery explicitly rejected the advice of house counsel, including Elton, that all business data be disclosed to Polycast.

The jury could further find, as plaintiffs argue in their briefs, that Plastics earned only $5.2 million in 1986, and that had plaintiffs known of the depth of the deception practiced upon them, they would not have closed the deal.

I do not say that the jury will make these findings. However, viewing the evidence in the light most favorable to the non-moving party, as required by the cases, the jury could do so.

What does "reliance" mean in this context? No rational jury could find that at the time of closing plaintiffs relied on the $13.3 million projection as *"bankable"*, in the sense represented during the September 5 meeting: "not subject to reduction." That perception could not, and did not, survive Schneider's October 27 conversation with Weber. Schneider, content to pay $111.6 million for Plastics on the basis of the September 5 $13.3 million projection, was content no longer. Concern for the earnings projection fueled that discontent, and led to a reduced purchase price.

But the jury could find that at the time of closing Polycast believed that the $13.3 million projection, while no longer "bankable" in that precise amount, had nonetheless been calculated and communicated in good faith by Uniroyal and Plastics. The jury could find, in other words, that Polycast continued to rely on the integrity of the process, although it no longer relied on the particular end figure. The distinction is pragmatic and accords with common sense. Plaintiffs' fraud claim is not so much that the particular $13.3 million was inaccurate, but that the process producing the projection was corrupt: a conclusion the jury could easily reach if it accepts the testimony of Kirrane, arguably corroborated by other evidence.

Polycast was entitled to rely on the defendants' good faith in projecting Plastics' earnings. It was entitled to rely on the integrity of the $13.3 million projection, even if probable cause had arisen to doubt its accuracy. If Polycast had known then what discovery has arguably revealed about the corruption of the process, it is not fanciful to suggest that plaintiffs would have cancelled the deal. At least the jury could draw that inference. Therefore, in a real sense, Polycast continued to rely on the $13.3 million estimate; or so a jury could find.

Was that continued reliance reasonable? "Whether or not reliance was justifiable is ordinarily a question of fact to be determined by the trier of fact on all of the facts and circumstances proven at trial." *Stratford Group Ltd. v. Interstate Bakeries*, 590 F.Supp. 859, 865 (S.D.N.Y.1984) (construing New York law). The contentions of the parties with respect to reliance raise issues of fact for trial.

▮ As for cancellation of the Northrop contract, Uniroyal and Plastics chose not to disclose the cancellation to Polycast before the closing. Accordingly "positive proof of reliance is not a prerequisite for recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [the] decision." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972). The jury could find that cancellation of the Northrop contract was material. The jurors could consider the doomsday expressions of alarm voiced by Plastics and Uniroyal officers when contemplating the possibility of a cancellation. To be sure, defendants now contend that the Northrop cancellation was a blessing in disguise because the contract was losing Plastics money. Plaintiffs dispute that proposition. The question is one of considerable cost accounting and economic complexity. It poses a triable issue of fact.

■ As for the estimates of Plastics' 1987–1990 earnings, Judge Walker recognized in one of his prior opinions that plaintiffs allege these later forecasts were " 'based in part' on the allegedly false 1986 forecasts." 728 F.Supp. at 942–43. Plaintiffs' fraud claim arising out of these later estimates poses triable issues of fact.

Defendants argue that since plaintiffs' investment bankers at the Boston office of Drexel Burnham Lambert formulated their own reduced projection for 1987 through 1990 earnings, Polycast cannot be said in law to have relied upon the higher estimates furnished by defendants on July 2, 1986. It is true that Drexel Boston performed such calculations in connection with the private placement memorandum issued by plaintiffs in October 1986. But the jury could find that all plaintiffs and their advisers did was to reduce the 1987–1990 forecasts proportionately to Uniroyal's reduction of Plastics' 1986 earnings to $13.3 million, so that in practical effect defendants were also responsible for these later projections by the other side.

■ Next the defendants argue that plaintiffs cannot prove causation. With respect to the $13.3 million 1986 estimate, they argue, first, that the estimate did not cause Polycast any "cognizable damages"; and second, that even if damages occurred, plaintiffs cannot prove loss causation.

On the first of these contentions, defendants rely upon particular declarations made by or on behalf of plaintiffs which they regard as admissions against interest. In February 1987 Schneider met with officers of the Continental Illinois Bank and Trust Company of Chicago, a potential lender, and said according to contemporaneous documentary evidence that the $110 million purchase price paid "is fair from an historical earnings viewpoint but can be considered a bargain price if the future potential of the company is considered."

Secondly, defendants point to consolidated financial statements in UPAC's Form 10K for the year ended September 1987. Those financials included an entry for $75 million of goodwill arising from the acquisition of Plastics, which defendants say "re-flects the difference between the $110 million purchase price, plus contingent liabilities recorded, less the value of Plastics' assets." Main brief at 38. The SEC staff, responding to that Form 10K, noted that while UPAC recognized and recorded on its balance sheet in September 27, 1987 $75 million in goodwill resulting from the acquisition of Plastics, it had also disclosed that Polycast had commenced suit against Uniroyal for not less than $75 million in damages caused by misrepresentations concerning Plastics' financial state, earnings potential and operating conditions. The SEC staff regarded these statements as inconsistent and asked for an explanation. Defendants contend that the reference to goodwill demonstrates as a matter of law that the purchase of Plastics caused plaintiffs no cognizable damage, as that concept is defined in section 10(b) actions by *Randall v. Loftsgaardan*, 478 U.S. 647, 661–662, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) (out-of-pocket measure of damages consists of the difference between the fair value of all that the purchaser received and the fair value of what he would have received had there been no fraudulent conduct).

Plaintiffs respond that Schneider's statements to the Continental Illinois Bank as reflected in the pertinent exhibit could not have been made later than February 1987, when Schneider made his presentation to that potential investor. Schneider told the bank that, based upon his then existing impressions, Plastics would earn $10 million in 1986 and $17 million in 1987. These amounts were less than defendants had represented. More significant to the present question, plaintiffs say without contradiction that the field work on the audit of Plastics' financial statements for the ten months ended October 31, 1986 was not completed until May 1987; and it was not until then that Polycast learned that Polycast that Plastics only earned $3.709 million for those 10 months. Plaintiffs say that Schneider's statements to the bank in February 1987 prove nothing more than the depth of defendants' deception.

As for UPAC's correspondence with the SEC staff, plaintiffs point out that eventually the SEC concluded there was no inconsistency between the lawsuit's claims against Uniroyal and the goodwill entry in the Form 10K. That was because UPAC had allocated the goodwill to Plastics' profitable businesses, which were expected to generate sufficient pre-tax income to allow amortization of the allocated goodwill over 14 years. At the conclusion of the correspondence, the SEC was content to require UPAC and Polycast to agree that they would credit any recovery from the litigation to goodwill.

These declarations are admissible against plaintiffs under Rule 801(d)(2), F.R.Evid. However, they fall well short of establishing as a matter of law that plaintiffs suffered no cognizable economic loss, particularly since economic loss in section 10(b) cases may in certain circumstances be measured by "out-of-pocket loss, the benefit of the bargain, or some other appropriate standard." *Osofsky v. Zipf,* 645 F.2d 107, 111 (2d Cir.1981). Conceptually at least, a party's admissions may demonstrate beyond cavil that it has suffered no economic loss; but plaintiffs' explanations for and interpretations of the declarations upon which defendants rely pose triable issues.

Defendants also note that Polycast sold three of Plastics' businesses for amounts totalling $91 million, and indicated to the SEC that it had received offers for others. Defendants say that accordingly the total proceeds of the divestiture of Plastics' businesses "would far exceed the price Polycast paid for Plastics," main brief at 40, so that Polycast suffered no loss. Plaintiffs respond that these gross sales prices were acquired at the cost of plaintiffs assuming "immense liabilities" under the SPA, such as unfunded pension liabilities (estimated at approximately $75 million before tax or $54 million net of tax) and environmental liabilities (estimated at $13 million). Defendants reply that nonetheless, Polycast has realized a net gain (that is, the price exceeded the cash cost and the liabilities assumed) on the businesses it has sold. Reply brief at 21 n. 13.

I decline to hold this record or in response to these arguments that plaintiffs cannot establish a cognizable economic loss as a matter of law. Defendants confine their analysis to out-of-pocket loss, but this is not an exclusive measure of compensatory damages, as the Second Circuit held in *Osofsky.* Benefit-of-the-bargain is a possible alternative measure of compensatory damages. In *Levine v. Seilon, Inc.,* 439 F.2d 328, 334 (2d Cir.1971), Judge Friendly said in dictum that in section 10(b) cases a defrauded buyer of securities "is entitled to recover only the excess of what he paid over the value of what he got, not, as some other courts had held, the difference between the value of what he got and what it was represented he would be getting." More recently the Second Circuit has extended the benefit-of-the-bargain measure of damages under the 1934 Act to the "limited situation" where "misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger." *Osofsky* at 114. *But see Freschi v. Grand Coal Venture,* 588 F.Supp. 1257, 1259 (S.D.N.Y.1984) (limiting *Osofsky* to its facts and applying out-of-pocket measure of loss to section 10(b) claim).

On this motion for summary judgment, I need not further consider the present state of appellate authority on the measures of compensatory damages available to buyers under the 1934 Act because plaintiffs at bar also assert claims for common law fraud. In *Osofsky* the Second Circuit said that "the benefit-of-the-bargain measure of compensatory damages is recognized as the preferable measure in common law fraud actions." Citing Prosser's text and the Restatement (Second) of Torts (1977) for that proposition, Judge Oakes went on to say at 114:

Thus, the *Restatement (Second) of Torts* § 549(2) (1977) provides, in the case of a fraudulent misrepresentation in a business transaction, for the recovery of "damages sufficient to give [the recipient] the benefit of his contract with the maker, if these damages are proved with reasonable certainty." Though out-of-

pocket loss may be the usual and logical form of compensatory relief in tort actions, Comment g on section 549(2) explains that this measure of damages does not always afford "just and satisfactory" compensation when the plaintiff has made a bargain based on fraudulent representations by the defendant. Therefore "the great majority of the American courts [have adopted] a broad general rule giving the plaintiff, in an action of deceit, the benefit of his bargain with the defendant in all cases, and making that the normal measure of recovery in actions of deceit." *Id.* Otherwise, in situations such as that involved in the instant case, "the defendant [would be] enabled to speculate on his fraud and still be assured that he [could] suffer no pecuniary loss," *id.* at Comment i.

That analysis applies squarely to the present plaintiffs' common law fraud claim, which a jury could conclude had been shown by clear and convincing evidence.

Even if the analysis be confined to out-of-pocket compensatory damages, plaintiffs' expert witness is prepared to testify that "Plastics was worth approximately $60 million on October 31, 1986." Plaintiff's brief at 67. If the jury accepts that figure, the $110 million purchase price establishes an out-of-pocket losses. To be sure, expert evaluations are subject to cross-examination and challenge; but that is the function of plenary trials, not summary dispositions.

Defendants are not entitled to summary judgment on the basis that plaintiffs suffered no cognizable damage as a matter of law. In reaching that conclusion, I have considered all of the evidence culled by the defendants from the extensive discovery record in support of their contentions, whether or not specifically addressed *supra.*

The C & D defendants require separate consideration. They contend that even if "there is sufficient evidence as to misrepresentation and loss causation to go to the jury," defendants' brief at 88 (and there is), nonetheless the fraud claims must be dismissed as to the C & D defendants because there is no evidence suggesting they were involved in the formulation of Plastics' earning projections, including the $13.3 million projection upon which plaintiffs' fraud claims are primarily based, or that the C & D defendants had the intent to deceive plaintiffs.

In his opinion reported at 728 F.Supp. 926, Judge Walker held that Polycast's third amended complaint (identical to the present pleading in this respect) sufficiently alleged scienter on the part of the C & D defendants. Judge Walker focused upon the alleged participation of Rice and Dubilier in the events surrounding the offering of Plastics for sale and the ultimate consummation of the sale to Polycast. Judge Walker concluded his discussion on the point by saying: "Polycast's allegations of Rice and Dubilier's beneficial interest in Uniroyal's assets implicitly established a motive for committing fraud. The allegations of their involvement in the preparation of the offering memorandum demonstrate an opportunity for doing so and support the inference of knowledge on their part." *Id.* at 936.

The C & D defendants now argue that the allegations sufficient to support an inference of scienter have been proven hollow by the evidence, or lack of evidence, adduced during discovery. They pray for summary judgment dismissing the fraud claims against them for that reason. Consistent with the authorities cited *supra*, my proper function is to assess whether the C & D defendants' scienter (obviously a material fact under the governing law) presents a genuine issue requiring trial. In answering that question, I resolve all ambiguities in the evidence and draw all reasonable inferences in favor of plaintiffs and against the C & D defendants.

The motive of Rice and Dubilier to commit fraud upon a purchaser of a Uniroyal asset such as Plastics is manifest. Rice and Dubilier managed all the C & D Entities. Those entities held a 32.5% equity interest in Uniroyal. The leveraged buyout had saddled Uniroyal with $900 million in debt. To maximize a return to the C & D entities, it was necessary to maximize the

sale price of a Uniroyal asset like Plastics. These economic truths are illustrated by a post-closing cash distribution which occurred in December 1986. At that time C & D Private Equity received 32.5% of the cash distribution, or $60,206,250; C & D Associates received $6 or $7 million; and Rice and Dubilier each received approximately 45% of that amount.

A section 10(b) plaintiff must prove its case by a preponderance of the evidence only, and not by clear and convincing evidence. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91, 103 S.Ct. 683, 692, 74 L.Ed.2d 548 (1983). As for scienter the Court said at 390 n. 30, 103 S.Ct. at 692 n. 30:

> The Court of Appeals also noted that the proof of scienter required in fraud cases is often a matter of inference from circumstantial evidence. If anything, the difficulty of proving the defendant's state of mind supports a lower standard of proof. In any event, we have noted elsewhere that circumstantial evidence can be more than sufficient. (citing cases).

■ Motive based upon personal gain is a recognized circumstance from which intent to commit fraud may be inferred. Rice and Dubilier had that motive to commit fraud upon a purchaser of Plastics.

Another circumstance is whether Rice and Dubilier should be regarded as "insiders" or "outsiders" in the conduct of Uniroyal's affairs.

At the pertinent times Rice and Dubilier, together with Flannery, Uniroyal's chairman, chief executive officer and president, comprised the company's three-man executive committee. Nonetheless, Rice and Dubilier say they should not be considered Uniroyal insiders. They cite *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1306 (2d Cir. 1973) for that proposition. In *Lanza* the Second Circuit adopted an academic definition of "outside directors—*i.e.,* directors who are not full-time employees of the corporation." *Id.* at 1306 (quoting Bishop, *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification Of Corpo-* *rate Directors and Officers,* 77 Yale L.J. 1078, 1092 (1968)).

More recently, the Second Circuit has said in evaluating a pleading of fraud under Rule 9(b), Fed.R.Civ.P. that no specific connections between fraudulent representations and particular defendants are necessary where "defendants are insiders or affiliates participating in the offer of the securities in question." *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). *See also DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987) (citing and applying *Luce* ).

Applying that somewhat expanded definition of "insider" to the proof developed through discovery, I conclude that a jury could rationally regard Rice and Dubilier as Uniroyal "insiders or affiliates participating in the offer" of Plastics for sale. Accordingly the status of Rice and Dubilier is also a circumstance which the jury may consider on the issue of scienter.

The membership of Rice and Dubilier on the three-man Uniroyal Executive Committee is not determinative of the issue, although certainly it is probative. As defendants observe, between meetings of the full board of directors its powers were delegated to the executive committee; "Rice and Dubilier were never officers of Uniroyal or Plastics, and they played no role in the day-to-day management of either company." Reply Brief at 33–34. True enough, if by "day-to-day management" we mean the shipping of orders, collection of bills, and controlling inventory. But the issue is whether Rice and Dubilier were "insiders or affiliates participating in the offer" of Plastics for sale and the consummation of that sale to Polycast. There is sufficient evidence to allow that characterization. On some occasions Dubilier, on other occasions Rice attended meetings or engaged in conversations with officers of Uniroyal concerning forecasts to be included in the offering memorandum, as well as subsequent reductions in the 1986 Plastics earnings estimate, and what should be done about those reductions in the context of the ongoing negotiations with Polycast. These and other meetings and conversa-

tions gave rise to contemporaneous notes or testimonial recollections the import of which the parties dispute, but to the extent they militate in favor of plaintiffs must on this motion be construed in their favor. For example, it is common ground that on February 26, 1986 Dubilier had a conversation with Graham about the offering memorandum's references to Uniroyal's projected financials. Graham made a contemporaneous note of that conversation which reads: "M. Dubilier. Tone down the language or increase the forecast." Graham, also a defendant in the case, testified that Dubilier said that the language in the offering memorandum was "too optimistic" because "it doesn't correspond with the numbers. So if the numbers are what they are, you better tone the language down because it's too positive." Graham Dep. at 258. Defendants say in their brief at 95 that "the only reasonable inference" to be drawn from Graham's testimony "is that Dubilier wanted the offering memorandum to be as accurate as possible, and took what steps were necessary to insure that it was." The trouble is that Graham's testimony dealt with only part of what his note records Dubilier as having said, namely, "tone down the language or *increase the forecast.*" A jury could rationally regard the alternative suggested solution, namely increasing the forecast to square with the "positive" language, as a badge of fraud. The jury could also accept the testimony of Jonathan Furer, a Polycast officer, that at the crucial September 5, 1986 meeting where the $13.3 million projected 1986 earnings for Plastics was put forward as a rock bottom figure, Rice uttered reassurances purported by based upon his own prior experience in similar situations.

To be sure, there is no evidence in the record directly establishing that either Rice or Dubilier knew that the $13.3 million projection was false, or that they had expressed the specific intent to defraud Polycast. But there need not be, given the holding in *Herman & Maclean v. Huddelston, supra,* that scienter may be and often is proved by inferences from circumstantial evidence. Viewing the evidence in the light most favorable to plaintiffs, as I am re-

quired to do, I conclude that the scienter of the C & D defendants is for the jury.

Plaintiffs are also entitled to have the jury consider their alternative theory of section 10(b) liability, that Rice and Dubilier acted with reckless disregard of the fraud of others. Even outside directors may be liable if they "failed or refused, after being put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort." *Lanza v. Drexel & Co., supra,* at 479 F.2d 1306 n. 98. Rice and Dubilier acknowledged that they knew of Uniroyal's several reductions in the Plastics earnings forecasts during 1986. Rice said he made no effort to find out only the forecasts were reduced, but conceded that "I could pick up the telephone any time I wanted to and call [Flannery] and say, what did the earnings do." Rice Dep. at 329–30. The ability of Rice and Dubilier to get to the bottom of the forecast reductions is inherent in their positions as members of Uniroyal's executive committee. Accepting for the sake of this analysis that Rice & Dubilier knew nothing about the reasons for the reductions in forecasts, there is evidence from which the jury could find that without "extraordinary effort" they could have discovered that Uniroyal officers were engaging in fraud.

Lastly the liability of the C & D defendants, or at least of Rice and Dubilier as controlling persons of Uniroyal, presents a triable issue. As Judge Walker has held in the case at bar, controlling person liability under § 20(a) does not require proof of scienter. Liability attaches if there was a primary violation, control of the primary violator by the defendant and the defendant's culpable participation in the actions forming the predicate for the securities law violation. [1988–89 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 94,005 at 90,695–96, 1988 WL 96586. Whether or not in the particular circumstances of this case it is the C & D defendants' burden to prove good faith, *cf. Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 716 (2d Cir.), *cert. denied sub nom Wood Walker & Co. v.*

*Marbury Management, Inc.,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the issues of the control Rice and Dubilier exercised over Uniroyal in the conduct of the sales negotiations, and the propriety of that conduct, give rise to triable issues.

I deny the motions of all defendants for summary judgment dismissing the section 10(b) and common law fraud claims.

### The Section 12(2) Claim

Plaintiffs' second and third claims allege violation of section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2). The second claim charges all defendants with violating that section. Some are charged as principals, others as aiders and abettors or controlling persons. The third claim charges the C & D defendants as principals.

All defendants contend that section 12(2) is inapplicable to the transaction alleged in the complaint.

Section 12(2) of the 1933 Act provides in pertinent part:

> Any person who ... offers or sells a security ... *by means of a prospectus or oral communication,* which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him ... (emphasis added).

■ Section 12 deals with the liability of "statutory sellers" of securities. *See Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (construing section 12(1)). Section 12 liability is broader than liability for fraud. Statutory sellers "may now be liable under section 12 whether or not scienter or loss causation is shown." *Wilson v. Saintine Exploration and Drilling Corp.,* 872 F.2d 1124, 1126 (2d Cir.1989) (applying *Pinter* rationale to a section 12(2) claim). *See also Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988)

(under section 12(2), sellers' "material misrepresentations and omissions render them strictly liable to plaintiffs"); *Ballay v. Legg Mason Wood Walker, Inc.,* 925 F.2d 682, 689 (3rd Cir.1991) (in contrast to section 10(b), section 12(2) "makes actionable negligent misrepresentation absent proof of scienter or fraud").

■ Notwithstanding these less demanding standards for liability, a section 12(2) plaintiff must still prove that the defendants sold the security "by means of a prospectus or oral communication." "Prospectus" has a recognized meaning. Congress did not define the words "oral communication" in the 1933 Act. In *Ballay* the Third Circuit applied to the phrase "prospectus or oral communication" the *maxim noscitur a sociis,* that a word is known by the company it keeps, and construed the phrase to mean "that buyers may recover for material misrepresentations made in a prospectus or in an oral communication related to a prospectus or initial offering." 925 F.2d at 688. *Ballay* went on to hold that section 12(2) did not apply to a broker-seller of securities in the secondary market.

While defendants at bar rely on *Ballay,* plaintiffs correctly observe that the transaction in suit does not involve the secondary market, but rather the direct sale of securities (the outstanding shares of Plastics) as part of the sale of that company to Polycast. Nonetheless, *Ballay* is instructive in its implicit requirement that the prospectus or oral communication have something to do with the challenged sale.

The Second Circuit had previously made that requirement explicit in *Jackson v. Oppenheim,* 533 F.2d 826 (2d Cir.1976). The Second Circuit held that while a section 12(2) plaintiff need not prove the particular kinds of causation required in fraud claims, nevertheless "he must still prove that the challenged sale was effected 'by means of' the communication viewed as a whole. That is to say, the communication as a whole must have been instrumental in the sale" of the securities. *Id.* at 829–30. Expanding on that concept, the court of ap-

peals said that where the defendant's liability is based on a sale of securities

Section 12(2) requires there to be some causal relationship between the challenged communication and the sale, even if not "decisive." In short, the communication must have been intended or perceived as instrumental in effecting the sale. *Id.* at 830 n. 8.

The inquiry is fact-specific, as illustrated by Judge Tenney's opinion in *Eriksson v. Galvin*, 484 F.Supp. 1108–1125 (S.D.N.Y. 1980):

The Court concludes, as in *Jackson*, that neither the challenged communications nor the so-called omissions were responsible for the plaintiff's conduct. "[T]here was an abundance of evidence of the matters the plaintiff really considered important in entering this face to face transaction," *Titan Group, Inc. v. Faggen*, 513 F.2d 234, 239 (2d Cir.), *cert. denied*, 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975), and Eriksson was well aware of the opportunities and risks inherent in his agreement with the defendants. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978); *Spielman v. General Host Corp.*, 538 F.2d 39, 41 (2d Cir.1976). Accordingly, a section 12(2) claim has not been established because the alleged misrepresentations and omissions were not "instrumental in effecting the sale." *Jackson v. Oppenheim, supra*, 533 F.2d at 830 n. 8.

In the case at bar, plaintiffs allege that the false or misleading statements of material facts giving rise to section 12(2) liability appear in the earnings projections for Plastics described in the complaint at ¶¶ 54–55, 60–61, 67–68, 70–71, 72–74, 80–82, 87, 104–105, 112–113 and 122. *See* Complaint at ¶ 150. These specified allegations trace the reductions in earning projections from the offering memorandum (¶¶ 54–55) through the May 8, 1986 lowering of the 1986 earnings forecast from $24.0 million to $22.5 million (¶¶ 60–61), to the June 12, 1986 lowering from $22.5 to $20.5 million (¶¶ 67–68), to the June 24, 1986 lowering to $17.6 million (¶¶ 70–71), together with the forecasted earnings for 1987, 1988, 1989, and 1990 (¶¶ 72–74), to the September 5, 1986 lowering of the 1986 forecast to $13.3 million. From these allegations plaintiffs argue in their brief at 84 that section 12(2) is implicated because the sale of the Plastics shares "was accomplished by means of a prospectus, the offering memorandum, and numerous oral communications."

■ Only the statements made on September 5, 1986 with respect to the 1986 $13.3 million earnings projection can arguably sustain a section 12(2) claim. Plaintiffs cannot be heard to say that the offering memorandum delivered in March 1986 was "intended or perceived" by plaintiffs "as instrumental in effecting the sale" because the SPA executed on July 23, 1986 specifically provided that it superseded "all other prior ... communications of the parties, oral or written, respecting such subject matter." By the same token, the pre-September 5, 1986 earnings projections cannot be regarded as instrumental in *effecting* the sale. On the contrary, those repeatedly lowered forecasts caused plaintiffs to *reject* the sale by terminating the SPA.

The $13.3 million 1986 earnings projection Uniroyal presented to Polycast at the September 5, 1986 meeting stands on a different footing. The jury could find that Polycast terminated the SPA in late August 1986, returned to the bargaining table in early September, received Uniroyal's assurances that, unlike the earlier forecasts, the $13.3 million 1986 earnings estimate were *really and truly* reliable, and agreed to purchase Plastics for $111.6 million on September 23. Notwithstanding the further purchase price reduction to $110 million, a jury could find that the September 5 earnings estimate was "related to a prospectus or initial offering," *Ballay*, and was "intended [by Uniroyal] or perceived [by Polycast] as instrumental in effecting the sale," *Jackson*.

■ Accordingly the September 5, 1986 earnings estimate gives rise to a triable issue of section 12(2) liability unless, as defendants argue in their main brief at 52, the general merger clause in the SPA bars the claim.

Article 10, Section 10.12 of the SPA provides:

> *Entire Agreement.* This Agreement, including the Letter, the Schedules hereto and the other documents delivered pursuant to this Agreement, and the confidentiality Agreement, contain all of the terms, conditions and representations and warranties agreed upon by the parties relating to the subject matter of this Agreement and supersede all other prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

Defendants argue that by this language, Polycast agreed "that any prospectus (like the Offering Memorandum) and oral communications were not part of its bargain with Uniroyal."

In one of his prior decisions, Judge Walker considered Section 10.12 within the somewhat analogous context of plaintiffs' common law claim for negligent misrepresentation. Judge Walker said that Section 10.12 is a "general merger clause ... which bars extra-contractual commitments of any kind." [1988–1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,005 (S.D.N.Y. Aug. 25, 1988) at 90,699. After reviewing the SPA and its accompanying documents, Judge Walker concluded that the alleged misrepresentations concerning Plastics' earnings projections (including the September 5, 1986 $13.3 million estimate) "were not extracontractual and hence are properly the subject of a negligent misrepresentation claim." *Ibid.* I will refer again to Judge Walker's construction of Section 10.12 of the contract, which defendants did not see fit to mention in their 103–page main brief, when I consider plaintiffs' negligent misrepresentation claim *infra.* Suffice it to say at this juncture that I agree with him; and because I do, and for the other reasons stated, I reject defendants' contention that section 12(2) is entirely inapplicable to this transaction. The September 5, 1986 "oral communication" falls within the statute.

■ Defendants Weber and Nevins make the alternative argument that they were not statutory sellers. Section 12(2) liability extends to a person "who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991), citing and quoting *Pinter v. Dahl.* Whether Weber or Nevins may be so characterized presents triable issues of fact. So does the issue of whether the C & D defendants exercised reasonable care, upon which those defendants will bear the burden of proof at trial.

I deny defendants' motion for summary judgment dismissing the section 12(2) claims.

*The RICO Claim*

In their fourth claim, plaintiffs charge all defendants with violating the RICO statute, 18 U.S.C. § 1962(c). They seek treble damages under § 1964(c). Defendants move to dismiss the RICO claim on the ground that their alleged conduct does not fall within the statute.

18 U.S.C. § 1962(c) makes it unlawful for persons employed by or associated with enterprises engaged in interstate or foreign commerce to conduct the affairs of such an enterprise "through a pattern of racketeering activity ..." In *H.J., Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court undertook to identify and define the ingredients and boundaries of a "pattern of racketeering activity." Justice Brennan's opinion commanded only a 5–4 majority, but it represents the Court's most recent articulation of the governing principles.

■ *H.J.* holds that a "pattern of racketeering activity" requires the combination of predicate acts related to each other and continuity of conduct. 492 U.S. at 239, 109 S.Ct. at 2900.

As for relatedness, the *H.J.* majority derived from Title X of the Organized Crime Control Act of 1970, of which RICO formed Title IX, the rule that to be related, predicate acts must have "the same or similar purposes, results, participants, victims, or

methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901.

However, the Court continued, the relatedness of racketeering activities is not sufficient to satisfy § 1962's "pattern" element. "To establish a RICO pattern it must also be shown that the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *Ibid.* (emphasis in original). As to continuity, the *H.J.* majority wrote:

"Continuity" is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. *See Barticheck v. Fidelity Union Bank/First National State*, 832 F.2d 36, 39 (CA3 1987). It is, in either case, centrally a temporal concept—and particularly so in the RICO context, where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated. *See* S.Rep. No. 91–617, at 158.

*Id.* at 241–42, 109 S.Ct. at 2902 (emphasis in original).

The civil complaint in *H.J.* alleged that at different times over the course of at least a six-year period telephone company officers and employees gave members of a state regulatory commission bribes in order to obtain approval of unfair and unreasonable utility rates. The Court noted plaintiff's "claim that the racketeering predicates occurred with some frequency at least over a six-year period, which *may* be sufficient to satisfy the continuity requirement." *Id.* at 250, 109 S.Ct. at 2906 (emphasis added). The case was remanded to the district court for further proceedings consistent with the Court's opinion.

In *Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.) (en banc), *vacated and remanded*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584, *original decision adhered to*, 893 F.2d 1433 (2d Cir.1989), plaintiffs alleged that defendants made a number of material misrepresentations in an offering plan for the conversion of an apartment complex into condominiums. The plan was mailed to more than 800 addressees. The complaint alleged additional facts sufficient to justify an inference that defendants would in the future be making further, equally fraudulent amendments to the offering plan. The Second Circuit held these allegations sufficient to describe a pattern of racketeering activity. The en banc majority and the three dissenting judges in *Beauford* agreed that the concepts of "relatedness" and "continuity" were crucial; and, in a departure from prior Second Circuit authority, observed that "our analysis of relatedness and continuity has shifted from the enterprise element to the pattern element." 865 F.2d at 1391. That shift presaged the Supreme Court's analysis in *H.J.*, which had not yet been decided.

In *Beauford* the Second Circuit defined Congress' goal in defining "pattern of racketeering activity" as to exclude from the reach of RICO criminal acts that were merely "isolated" or "sporadic." Consequently, Judge Kearse wrote for the en banc majority, "we must determine whether two or more acts of racketeering activity have sufficient interrelationship and whether there is sufficient continuity or threat of continuity to constitute such a pattern." *Id.* at 1391. Where the enterprise itself is associated with organized crime, that fact alone is sufficient to "tend to belie any notion that the racketeering acts were sporadic or isolated." *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir.1989) (en banc, decided with *Beauford* ).

When, however, there is no indication that the enterprise whose affairs are said to be conducted through racketeering acts is associated with organized crime, the nature of the enterprise does not of itself suggest that racketeering acts will continue, and proof of continuity of racketeering activity must thus be found in some factor other than the enterprise itself.

*Beauford* at 1391.

The complaint in *Beauford* was legally sufficient for these reasons:

In sum, read with ordinary charity, the amended complaint alleged that on each of several occasions defendant had mailed fraudulent documents to thousands of persons and that there was reason to believe that similarly fraudulent mailings would be made over an additional period of years. These allegations sufficed to set forth acts that cannot be deemed, as a matter of law, isolated or sporadic.

*Id.* at 1392.

The Supreme Court granted *certiorari* in *Beauford*, vacated the Second Circuit's judgment, and remanded the case to that court for further consideration in light of *H.J.* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). The Second Circuit gave *Beauford* that mandated further consideration and adhered to its en banc decision. 893 F.2d 1433 (2d Cir.1989).

*See also Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (continuity is sufficiently alleged where related predicates extend over "a matter of years."); *Official Publications, Inc. v. Kable News Co.,* 884 F.2d 664, 666–68 (2d Cir.1989) (allegedly fraudulent acts occurred "pursuant to a longstanding contract, over a considerable period of time"; contracts in suit were dated 1974 and 1980); *Procter & Gamble v. Big Apple Industrial Buildings, Inc.,* 879 F.2d 10, 18 (2d Cir.1989) ("the complaint must provide allegations sufficient to infer that an enterprise exists, and that the acts of racketeering were neither isolated nor sporadic;" allegations sufficient which claimed "that defendants engaged in at least five separate fraudulent schemes").

In *Creative Bath Products, Inc. v. Connecticut General Life Insurance Co.,* 837 F.2d 561, 564 (2d Cir.1988), the Second Circuit followed its own precedent and anticipated *H.J.* in holding that the plaintiffs failed to allege RICO "continuity" where their case "consisted of the proposition that defendants had made three fraudulent representations in pursuit of a single short-lived goal," *i.e.,* the sale of four insurance policies on the lives of two individuals. *See also United States v. Gelb,* 881 F.2d 1155, 1163–64 (2d Cir.1989) ("The requirement of continuity is satisfied; the schemes were conducted for about five years, and but for their discovery surely would have continued"); *Executive Photo, Inc. v. Norrell,* 765 F.Supp. 844, 846 (S.D.N.Y.1991) (" 'Congress was concerned in RICO with long-term criminal conduct.... Plaintiff's allegations of a scheme extending over more than two and one-half years ... fall within the scope of that concern,' " citing and quoting *H.J.* at 492 U.S. 242, at 109 S.Ct. 2902).

In his opinion allowing Polycast to amend its complaint a fourth time, Judge Walker concluded that the allegations sufficiently pleaded a RICO claim. 728 F.Supp. at 941–49. Judge Walker considered the Supreme Court's decision in *H.J.,* and concluded that the allegations concerning "defendants' issuance of the fraudulent $13.3 million earnings forecast, misrepresentation of Plastics' 1987–90 earnings forecast, and failure to disclose the cancellation of the Northrop contract," conduct allegedly taking place "over a period of eight and one half months" in furtherance of "a complex, multi-faceted conspiracy to defraud executed by numerous officers and stockholders," sufficiently established at the pleading stage a "pattern" of racketeering activity. *Id.* at 948. Adjudicating a motion to dismiss, Judge Walker read the facts alleged in the complaint in the light most favorable to the plaintiffs. *Ibid.*

A threshold question arises as to whether Judge Walker's ruling on the motion to dismiss constitutes the law of the case, precluding a contrary ruling on the

present motion for summary judgment. I conclude that the law of the case doctrine does not preclude this Court's evaluation of plaintiffs' RICO claim. The policies underlying the law of the case doctrine are by no means an absolute bar to reconsideration of a prior ruling, by the district judge who made the ruling or a different judge to whom the case may have been reassigned.

"It is well established that the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment, and may be modified to the same extent if the case is reassigned to another judge." *In re United States*, 733 F.2d 10, 13 (2d Cir.1984). "[T]here is no imperative duty to follow the earlier ruling—only the desirability that suitors shall, so far as possible, have reliable guidance how to conduct their affairs." *Dictograph Products Co. v. Sonotone Corp.*, 230 F.2d 131, 135 (2d Cir.1956) [L. Hand, J.]. Prior rulings may be re-considered in the light of now prevailing legal standards and a more complete factual record developed during discovery. *See Group Health Inc. v. Blue Cross Association*, 739 F.Supp. 921, 929–30 (S.D.N.Y.1990).

 In the case at bar, I conclude that the facts as developed during discovery do not establish the requisite element of continuity. There is no basis for a finding of open-ended continuity. The sale by Uniroyal of Plastics to Polycast was a one-shot, non-recurring deal, and the shot has been fired. It cannot be said of the conduct of the defendants at bar that, as frequently occurs in criminal cases, "by their very nature these acts threaten repetition and thereby satisfied the continuity prong of the pattern requirement." *United States v. Simmons*, 923 F.2d 934, 951 (2d Cir. 1991).

Accordingly the element is satisfied, if at all, by the concept of closed-end continuity. Plaintiffs allege a single scheme (albeit with a number of predicate acts and participants) to defraud a single victim in a single transaction. As Judge Walker observed, a "single victim-single injury scheme" may under *H.J.* satisfy "the continuity prong of the pattern requirement." *Id.* at 948 n. 5. But these considerations remain pertinent to a determination of whether the defendants' conduct falls within the scope of congressional concern for "long-term criminal conduct."

Plaintiffs allege as RICO predicate acts violations of the securities laws and of the mail and wire fraud statutes. The first securities violation plaintiffs allege in the fourth amended complaint occurred on or about July 2, 1986, when the "defendants" (unspecified) communicated to Polycast false earnings forecasts for Plastics for 1987, 1988, 1989 and 1990. ¶ 166. The second securities predicate act is alleged to be defendants' failure to advise Polycast that Northrop had cancelled its contract with Plastics. ¶ 167. Northrop cancelled the Plastics contract in September 1986. ¶ 168. The third securities law predicate act alleged relates to the September 5, 1986 representation of the $13.3 million 1986 earnings estimate, an estimate repeated in the letter agreement dated September 23, 1986. ¶¶ 168, 169. The fourth securities law violation alleged as a predicate act is the selling of Plastics' shares to plaintiffs on October 31, 1986. ¶ 170. Lastly, plaintiffs allege as securities law violations by defendants the issuance, placing and sale by plaintiffs of debt securities in reliance upon defendants' misrepresentations. ¶ 171.

As for mail and wire fraud, the predicate acts alleged begin with a telephone conversation on February 13, 1986, between Dubilier and Castaldi, Alvine, and Nevins concerning the inclusion of expense information about Plastics in the Plastics Offering Memorandum. ¶¶ 174, 176. The last mail or wire fraud predicate act alleged occurred on September 18, 1989, when Kirrane sent a copy to Castaldi of a facsimile transmission Kirrane had received on September 16, 1986 from Nevins with respect to 1986 Plastics' earnings forecast, whose contents are alleged to be fraudulent. ¶¶ 120, 121.

When Judge Walker considered the legal sufficiency of plaintiffs' RICO claim in their proposed amended pleading, he reject-

ed plaintiffs' effort to allege earlier earnings estimates as predicate acts. It is useful to quote Judge Walker's reasoning on that point:

Polycast's allegations of fraud in the revised earnings forecasts do not satisfy these requirements and are deficient as separate section 10(b) claims. Polycast states in its complaint that it relied on the final $13.3 million forecast in entering its final, successful bid for Plastics. Proposed Amended Complaint at ¶ 122. Plaintiffs cannot maintain that they ultimately relied on both the earlier, higher estimates and the final, reduced forecast simultaneously. While plaintiffs may have relied on the earlier forecasts in deciding to pursue the bidding process with Uniroyal, this reliance is not actionable under section 10(b) which gives private plaintiffs a right of action only if that reliance culminates in an actual sale or purchase of securities. Although Polycast did ultimately purchase securities, they purchased in reliance on the $13.3 million forecast, not the earlier projections. Where a claim of fraud under section 10(b) is deficient for failure to adequately allege causation, it cannot serve as a predicate act for a civil RICO claim.

728 F.Supp. at 941–42.

The temporal boundaries in plaintiffs' amended pleading following Judge Walker's opinion, their fourth amended complaint, reflect the limitations properly imposed by the judge's analysis.

In their brief on the present motion, plaintiffs now argue that "[d]iscovery has proven that defendants' fraudulent scheme actually lasted well over a year." Brief at 93. The scheme began, according to plaintiffs' present contention, in October 1985, when Uniroyal and Plastics prepared a budget, also known as the "profit plan", for Plastics. Brief at 7. Plaintiffs say that "Uniroyal dictated a forecast figure of $24.9 million" for inclusion in that profit plan, which in turn became "the basis for the $24 million forecast in the offering memorandum." *Id.* at 94. Plaintiffs cite deposition testimony from Weber and Kirrane to the effect that they believed the $24.9 million forecast was overstated when included in the profit plan.

Plaintiffs further argue in their present brief that the fraudulent scheme continued well after the closing. Specifically, plaintiffs say that on January 30, February 13, March 11, and March 24, 1987 "defendants" (unspecified) "mailed letters to plaintiffs demanding payments they alleged were due under the Purchase Agreement." *Id.* at 95. These mailings, plaintiffs say, constitute separate acts of mail fraud which could serve as predicate acts under RICO.

Judge Walker's opinion granting plaintiffs leave to file a fourth amended complaint asserting a RICO claim was dated November 21, 1989. Plaintiffs say that in a letter dated June 30, 1989, their counsel advised Judge Walker that plaintiffs could plead these additional predicate acts if, "in light of *H.J.*, the allegations of the complaint were not sufficient to make out a pattern under RICO." Plaintiffs say they never pleaded those additional predicate acts because Judge Walker held that the allegations in the proposed pleading were sufficient to fulfill the pattern requirement. Nevertheless, plaintiffs argue on the present motion, these acts "may properly be considered as proof in deciding whether plaintiffs have met the RICO pattern requirement," citing *United States v. Alkins*, 925 F.2d 541 (2d Cir.1991).[1]

Lastly, in an effort to extend the life of the alleged scheme, plaintiffs say in their brief at 96:

During the time that defendants committed these unpleaded predicate acts, their fraudulent scheme was kept alive by defendant Alfred Weber, who stayed on as President of Plastics after the closing and eventually entered into an employ-

---

1. In *Alkins*, a criminal case, the court of appeals considered testimony of conduct beyond "the acts charged as predicates in the indictment" in concluding that open-ended continuity had been proven: "The evidence indicates that this activity would have continued but for its discovery." 925 F.2d at 552–53. There is no comparable evidence in the case at bar.

ment contract with Plastics. Unbeknownst to Polycast, during the months following the closing, Weber continued to supply Polycast with fraudulent forecasts. He also concealed the fact that the forecasts that had been given to Polycast by Uniroyal were fraudulent and that he had personally participated in the fraud.

Weber and the other conspirators have kept close ties since the closing. Defendants Alvine, Nevins and Weber are in business together at Charter Power, a company they set up. Defendant Flannery now works for defendants Rice and Dubilier at C & D. Certain of the defendants remain together as trustees of the Liquidating Trust. Thus, the RICO enterprise has not disbanded.

I will assume for this discussion that plaintiffs may offer a brief as the functional equivalent of moving under Rule 15 for leave to file a fifth amended complaint for the purpose of alleging additional predicate acts. Considering those allegations on their merits, they do nothing to extend the duration of the fraudulent scheme, as alleged in the fourth amended complaint, or as revealed by the proof (viewing the latter in the light most favorable to plaintiffs).

As for the asserted earlier starting date of the scheme, plaintiffs are foreclosed by Judge Walker's prior analysis from relying upon October 1985 events resulting in the $24 million Plastics earning forecast first appearing in the profit plan and then in the offering memorandum. Plaintiffs argued before Judge Walker that the C & D defendants' role in the deception "began in December 1985 when they began preparing the allegedly fraudulent offering memorandum upon which Polycast relied in purchasing Plastics and continued until the sale of Plastics closed on October 31, 1986." 728 F.Supp. at 933. But Judge Walker held that the earlier projections could not form the basis for a claim of fraud under section 10(b), and consequently could not serve as predicate acts for a RICO claim. I adopt Judge Walker's reasoning on that point, not because of the law of the case, but because it is manifestly correct. The same result obtains with respect to mail or wire communications generated in the course of producing those earlier projections.

Plaintiffs' efforts to extend the duration of the alleged scheme after the closing are equally unavailing. The four letters Uniroyal sent to Polycast in January, February and March 1987 related to Polycast's obligation, disputed by the parties, to pay taxes under the SPA for the first ten months of 1986. Such correspondence, while generated by the purchase, contained no fraudulent statements or omissions resulting in the purchase, which had closed on October 31, 1986. These subsequent mailings, innocent in themselves and only tangentially related to the underlying and previously accomplished fraud, play no part in continuity analysis. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1414, 1417–18 (3d Cir.1991) ("But the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice.... [A] defendant's deceptive actions are more important to the continuity analysis than otherwise innocent mailings. Thus, the relevant criminal conduct occurred during the initial eight month period, when the misrepresentations were made."); *United States Textiles, Inc. v. Anheuser–Busch Companies, Inc.*, 911 F.2d 1261, 1268 (7th Cir.1990) (where "each allegation of mail fraud and wire fraud apparently relates back to the extortion allegedly achieved by the December, 1980 contract," subsequent mail and wire transactions "and the length of time over which those transactions occurred was pure happenstance in light of the underlying concern which is the 'continuity' of the criminal activity.").

Nor do the post-closing activities of Weber and certain other defendants serve to extend the duration of the scheme. Plaintiffs say of Weber that for a time after the closing he continued as president of Plastics, continued to issue fraudulent forecasts, and "concealed" (that is, did not admit) the falsity of the prior earnings forecasts and the part he played in them. Plaintiffs also say that Alvine, Nevins and Weber are now in business together, Flannery works at C & D, and certain of the

defendants remain as trustees of the Liquidating Trust. Thus, plaintiffs say ominously, "the RICO enterprise has not disbanded."

As for Weber's post-closing activities as president of Plastics, plaintiffs do not say whether he "continued to supply Polycast with fraudulent forecasts" by means of mail or wire communications, so as to lay the basis for further predicate acts in considering continuity. By definition, Weber's failure to say anything about prior fraud does not implicate the mail fraud and wire fraud statutes, which deal with communications, not silence. Assuming for this discussion that Weber mailed or wired to Polycast post-closing fraudulent forecasts of Plastics' earnings, there is authority in criminal cases considering the statute of limitations for the proposition that attempts to "lull" the defrauded party into believing that no fraud has occurred fall within the statutes prohibiting mail or wire fraud. *See United States v. Lane*, 474 U.S. 438, 451–52, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986); *United States v. Elkin*, 731 F.2d 1005, 1008 (2d Cir.), *cert. denied*, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984) (a fraudulent verification letter sent to the Defense Department some two years after the defendant had received improperly obtained money from the government was a part of the scheme to defraud the government); *United States v. Rubin*, 609 F.2d 51 (2d Cir.1979), *aff'd.*, 449 U.S. 424, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). But even assuming that plaintiffs could somehow take advantage of this line of authority, Polycast had learned enough of the alleged fraud to give Uniroyal a written notice of claim under the SPA on December 10, 1986. *See* discussion of plaintiffs' seventh and eighth claims, *infra*. That notice of claim stated that Plastics' actual earnings in 1986 would be "materially less" than the $13,300,000 projected on September 23, 1986, as the result of a number of specified factors "known by a Responsible Officer [of Uniroyal] and wilfully withheld from [Polycast]." Thus any "lulling" effect of Weber's post-closing conduct had been dissipated not later than December 10, 1986, and the duration of the fraudulent scheme must be measured in months, not years.

If the reference in plaintiffs' brief to the present associations among certain defendants is intended to suggest the threat of repetition of the alleged scheme, thereby satisfying open-ended continuity, I find the suggestion to be entirely without substance. There is no suggestion that these defendants are proposing to sell other Uniroyal divisions to other purchasers in a comparably fraudulent manner. Nor can these defendants be said to have formed a "long-term association that exists for criminal purposes." *H.J.* at 242–243, 109 S.Ct. at 2902.

In consequence, the scheme of which plaintiffs may complain for RICO purposes began in February 1986 and was brought to a successful conclusion on October 31, 1986, or at the very latest on December 10, 1986. The scheme was intended to achieve, and did achieve, a single contract: the SPA by which plaintiffs purchased Plastics from Uniroyal.

Such a transaction, extending over a period of such limited duration, does not satisfy the continuity requirement of a RICO claim. That would be true even if, contrary to my conclusions just expressed, the duration of the scheme at bar had a duration somewhat in excess of one year, rather than eight months. I agree with the analysis of the Seventh Circuit in *United States Textiles, supra*, which after discussing *H.J.* said at 1269:

> If the concern is "continuity", however, and the price for that "continuity" is treble damages, costs and reasonable attorneys fees, *see* 18 U.S.C. § 1964, a natural and common sense approach to the pattern element of RICO would instruct that identical economic injuries suffered over the course of two years stemming from a single contract were not the type of injuries which Congress intended to compensate via the civil provisions of RICO.

*See also Kehr Packages, supra* at 1418 ("an eight-month period of fraudulent activity directed at a single entity does not constitute a pattern, absent a threat of

future criminal acts."); *Continental Realty Corporation v. J.C. Penney Company,* 729 F.Supp. 1452, 1454–1455 (S.D.N.Y.1990) ("long-term criminal conduct" requirement of *H.J.* not satisfied by allegations that defendants "committed several acts of mail and wire fraud over a period of more than one year" in furtherance of a scheme "narrowly directed toward a single allegedly fraudulent goal."); *Airlines Reporting Corp. v. Aero Voyagers, Inc.,* 721 F.Supp. 579, 585 (S.D.N.Y.1989) (repeated acts of mail fraud occurring "over thirteen months" insufficient to establish closed-end continuity). *See also* as the unreported district court cases cited in defendants' reply brief at 42.

The case at bar falls squarely within the holding in *H.J.* that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement: Congress was concerned in RICO with long-term criminal conduct." 492 U.S. at 242, 109 S.Ct. at 2902.

Plaintiffs' RICO claim will be dismissed.

*Negligent Misrepresentation Claim*

Plaintiffs' sixth claim, against all defendants, charges them with a failure to exercise reasonable care in making representations to plaintiffs concerning the financial status, earnings potential, and operating condition of Plastics. In aid of that claim plaintiffs allege that the defendants were under a duty to exercise reasonable care in making those representations which arose from "their relationship of trust and reliance with plaintiffs," Complaint, ¶ 192. The individual defendants Elton, Dubilier, Flannery, Graham, and Rice are sued only in their capacities as trustees of the Liquidating Trust for the negligent misrepresentations of Uniroyal and CDU Holding, Inc.

 This claim is governed by New York law. The law of negligent misrepresentation, as declared by New York courts, recognizes that "generally there is no liability for words negligently spoken" but that "there is an exception when the parties' relationship suggests a closer degree of trust and reliance than that of the ordinary buyer and seller." *American Pro-*

*tein Corp. v. AB Volvo,* 844 F.2d 56, 63–64 (2d Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988) (citing and quoting *Coolite Corp. v. American Cyanamid Co.,* 52 A.D.2d 486, 384 N.Y.S.2d 808, 811 (1st Dept.1976)). To be liable for negligent misrepresentation, the speaker must be "bound by some relation of duty, arising out of contract or otherwise." *White v. Guarante,* 43 N.Y.2d 356, 363, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977). By definition, the elements of fraud need not be proven to establish a claim for *negligent* misrepresentation. However, the existence of a duty to exercise reasonable care in making representations depends in turn upon a special relationship between the parties. "In the absence of fraud and in the absence of a special relationship giving rise to a duty, it is up to the party hearing words he deems important to make them part of the contract." *American Protein Corp.* at 64.

An early articulation of the tort of negligent misrepresentation in New York appears in *International Products Co. v. Erie R.R. Co.,* 244 N.Y. 331, 155 N.E. 662, *cert. denied,* 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927). In *International Products* the New York Court of Appeals said that to state a claim for negligent misrepresentation, in addition to the other elements of the tort,

> the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care [citations omitted]. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered or *is about to enter into a contract* concerning the goods which are or *are to be its subject* is another.... When such a relationship as we have referred to exists may not be precisely defined. All that may be stated is the general rule.

244 N.Y. at 338, 155 N.E. at 664 (emphasis added).

In the case at bar, defendants move for summary judgment dismissing plaintiffs' negligent misrepresentation claim on two grounds. First, defendants say that no special relationship of trust and reliance existed between Polycast and Uniroyal. Second, defendants say that the provisions of the SPA "preclude recovery for extra-contractual representations of any kind," Main Brief at 59.

At the pleading stage, defendants made both these arguments to Judge Walker, who rejected them both in his August 25, 1988 opinion reported in the CCH service. Defendants make no reference to that decision in their lengthy main brief in support of the present motion. That omission left it to plaintiffs to cite and quote from Judge Walker's opinion in opposing defendants' motion for summary judgment. Defendants then had the last word on the subject in their reply brief, having deprived plaintiffs of the opportunity to address defendants' contentions in the summary judgment context by leaving Judge Walker's decision out of their main brief. While defendants' views of Judge Walker's opinion, first expressed in the reply brief, presumably came as no surprise to plaintiffs, nevertheless this tactic on the part of defendants' counsel smacks of sharp practice and I do not appreciate it.

On the special relationship issue, Judge Walker said during a careful review of the New York cases that he was "persuaded that Polycast enjoyed a relationship with defendants that was closer than that of buyer and seller." *Id.* at 90, 697. Of course that cannot be regarded as a finding of fact; Judge Walker was dealing only with the legal sufficiency of the proposed amended pleading, a distinction which the judge made clear later in his opinion when he wrote that "the Court, at the pleading stage, rejects defendants' argument that the claim must be dismissed because the parties enjoyed no special relationship." *Id.* at 90, 698–99.

The *Coolite* case stated that the requisite closer degree of trust and reliance is not found between "the ordinary buyer and seller," a choice of words suggesting that

there may be extraordinary circumstances, even in the context of a negotiated contract for purchase and sale. The *International Products* case made that clear over 60 years ago; the inquiry is intensely fact specific. Judge Walker characterized as "a case with strikingly similar facts" Judge Keenan's decision in *Delta Holdings, Inc. v. National Distillers and Chemical Corp.*, [1988–1989 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 93, 700 at 98, 221, 1988 WL 36330 (S.D.N.Y. April 8, 1988), which involved a negligent misrepresentation claim by a plaintiff who had purchased defendant's subsidiary and thereafter contended that the subsidiary's net worth was much less than the figure its balance sheet carried at the time the deal was struck. Judge Keenan denied a motion to dismiss the claim for negligent misrepresentation, notwithstanding that the underlying stock purchase agreement was entered into after months of negotiation and investigation by outside experts. Judge Keenan did not regard the fact that the parties had entered into a negotiated commercial relationship as dispositive. He relied on the language I have quoted from *International Products* to conclude that "such a black-letter rule is inappropriate. The 'special relationship' concept must be adaptable to numerous contexts, and turns on the facts of each case." *Id.* at 98, 228.

Not surprisingly, the New York cases generally hold that "[t]he issue of whether a 'special relationship' exists sufficient to make out a cause of action for negligent representation should ... be left to the finder of fact." *AFA Protective Systems v. American Telephone and Telegraph Co.*, 57 N.Y.2d 912, 914, 456 N.Y.S.2d 757, 758, 442 N.E.2d 1268, 1269 (1982) (in action by central station alarm company to recover damages for alleged misrepresentations by suppliers of private telephone lines essential to company's security alarms systems, summary judgment properly denied on issue of whether a "special relationship" existed between the parties). *See also Hutchins v. Utica Mutual Insurance Co.*, 107 A.D.2d 871, 484 N.Y.S.2d 686 (3rd Dept.1985) (whether "special relationship" existed between claimants and an insur-

ance adjuster sufficient to impose a duty upon the adjuster to provide correct information as to applicable law gave rise to question of fact precluding summary judgment); *Raymond Corp. v. Coopers & Lybrand*, 105 A.D.2d 926, 482 N.Y.S.2d 377, 380 (3rd Dept.1984) (Special Term's grant of summary judgment dismissing third-party claim for negligent misrepresentation against an individual who stated that corporation's financial records were accurate reversed; "[t]he existence of such a 'special relationship' presents a question of fact, not to be resolved at this preliminary stage of the proceedings"). *Hutchins* and *Raymond* both cite and follow *AFA Protective Systems*.[2]

In his August 25, 1988 opinion, after reviewing a number of New York cases, Judge Walker said:

> Polycast has alleged that during an extended negotiation period, defendants repeatedly vouched for their projections of Plastics' earnings, knowing that such earnings were critical to Polycast's willingness to consummate the transaction. Indeed, in August 1986, Polycast went so far as to withdraw from the Purchase agreement precisely because earnings expectations were lowered, only to agree to the deal again upon defendant's reassurances that this time earnings projection was accurate. Further, Polycast has alleged that defendants had superior information about Plastics throughout the negotiation period, and that it only gained complete access to the books after the deal was consummated. Additionally, in order to effect the transaction, Polycast formed a new corporation capitalized with $35 million of stock and $95 million in debt. From these facts, a relationship closer than the ordinary buyer-seller relationship can be inferred. *Id.* at 90,698.

I agree with Judge Walker that if such allegations are sustained by the evidence,

the jury would be permitted in law to find the existence of that special relationship necessary to a claim for negligent misrepresentation. The question on defendants' present motion for summary judgment is whether the evidence adduced on discovery shows that there is a genuine issue requiring trial as to the material fact of the existence *vel non.* of the special relationship. It bears repeating that I must resolve any ambiguities in the evidence against the defendants, as well as drawing any reasonable inferences against them. Having performed those exercises, I conclude without difficulty that the nature of the relationship between Polycast and the defendants presents an issue requiring trial. As Judge Walker recognized, the accuracy of Plastics' earnings projections lies at the heart of the case. I am mindful of defendants' argument that the special relationship and the reliance Polycast seeks to derive from that relationship are inconsistent with the amount of due diligence Polycast performed prior to the closing, with the assistance of experts of various kinds, shapes and sizes. This is a perfectly respectable argument but it is for the jury. The record also contains declarations of witnesses, admissible against Polycast, which could be read to suggest that the special relationship did not exist and Polycast did not place upon the earnings projections that reliance which a viable claim for negligent misrepresentation requires. Again, these arguments demonstrate triable issues of fact, but do not entitle the defendants to a summary disposition.

Alternatively, defendants claim that provisions in the SPA preclude any claim for negligent misrepresentation. As I noted during discussion during the section 12(2) claim, defendants made that argument based upon the general merger clause, Section 10.12, to Judge Walker, who rejected it in his August 25, 1988 opinion at 90,699. Judge Walker considered the SPA and the

---

**2.** In *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81 n. 12 (2d Cir.1980), the Second Circuit, undertaking to construe New York law, said: "Whether a relationship exists between the parties that will bring the negligent misrepresentation doctrine into play ... is generally treated as a question of law for the courts." The court of appeals cited to a comment in the 1974 edition of N.Y. Pattern Jury Instructions. *AFA Protective Systems,* which the New York Court of Appeals decided in 1982 and its progeny clearly establish a contrary view.

other documents which together form the parties' agreement. He concluded that the 1986 earnings projection for Plastics formed a part of the parties' agreement and consequently was not affected by the general merger clause, whose function was to bar reliance upon extra-contractual commitments of any kind. Unlike plaintiff's RICO claim, where between defendants' motion to dismiss and their motion for summary judgment the law evolved and the facts were developed during discovery, the purchase documents which were before Judge Walker are the same which are before me, and there have been no pertinent developments in the law. I decline defendants' invitation to read the contract differently than did Judge Walker. I think he was right. Nor does the modification clause, SPA Section 10.2, which states that the agreement that "shall not be amended or modified except by a writing duly executed" by the parties, add anything of substance to defendants' argument.

Defendants' motion for summary judgment dismissing plaintiff's negligent misrepresentation claim will accordingly be denied.

### Contract Claims

Polycast's seventh and eighth claims sound in contract. The SPA is the contract governing the parties' rights and obligations. The parties negotiated that contract. They exchanged drafts. Polycast's drafts expanded its rights and Uniroyal's obligations. Uniroyal's drafts contracted them. The SPA evolved. The parties executed it.

The seventh claim alleges breaches of warranties Uniroyal gave in the SPA. In the eighth claim Polycast seeks indemnity under the SPA for the alleged breaches of warranty.

Article 3 of the SPA, captioned "Representations and Warranties of Seller," contains the warranties Polycast says Uniroyal breached. § 3.9 provides:

*Absence of Undisclosed Liabilities.* Except for liabilities reflected or reserved against in the Financial Statements, reflected in the Letter, or incurred in the ordinary course of business subsequent to the Balance Sheet Date, the Company and its Subsidiaries do not have any liabilities or obligations of any nature, whether absolute, accrued, contingent or otherwise, which liabilities would be material to the business, operations or financial condition of the Company and the Subsidiaries taken as a whole.

The "Financial Statements" referred to in this section include Plastics' balance sheet as of December 29, 1985. The "Letter" is a Disclosure Letter furnished by Uniroyal which accompanied the SPA.

Section 3.10 provides in pertinent part: *Absence of Certain Changes or Events.* Since the Balance Sheet Date, all operations and business of the Company and each Subsidiary have been conducted in all respects only in the ordinary course, and there has not been: (*a*) any material adverse change in the business, operations, properties, financial condition or prospects of the Company and the Subsidiaries taken as a whole; ...

Section 3.19 provides:

*Completeness of Disclosure.* No representation or warranty by Seller in this Agreement contains *or on the date of the Closing will contain* any untrue statement of material fact or omits *or on the Closing date will omit to state* a material fact necessary to make the statements made not misleading. (emphasis added).

The parties agree that the effect of the italicized language is to "bring forward" the Section 3.9 and 3.10 warranties to the closing. The closing occurred on October 31, 1986.

Article 8 is captioned "Indemnification." Section 8.1 provides in its entirety:

*Non–Survival of Representations and Warranties.* All representations and warranties contained in Article 3 and 4 or made pursuant thereto shall not survive but shall expire upon the Closing and be of no further force or effect thereafter and subsequent to the Closing, no party shall have any liability to any other party with respect thereto, except that (*a*) the representations and warranties in the

last sentence of Section 3.2(c), in the second sentence of Section 3.7, and in the first three sentences of Section 3.16 shall survive until December 31, 1987; and (*b*) the representations and warranties in Section 3.9 and 3.10, in the first sentence of Section 3.12 and in Section 3.14 shall survive until December 10, 1986; *provided, however,* that Buyer shall not be entitled to be indemnified under Section 8.2 for a breach of any representation or warranty in Section 3.9, 3.10 (except for 3.10(b)), 3.12 or 3.14 unless any officer or employee of Seller or the Company designated as a Responsible Officer in the Letter had knowledge of such breach as of the Closing Date and willfully withheld such knowledge from Buyer.

Section 8.2(a) obligates Uniroyal as Seller:

to indemnify and hold harmless the Buyer Indemnitee against and in respect of any and all

(i) claim, suits, actions, proceedings (formal and informal), investigations, judgments, deficiencies, damages, settlement, liabilities, and legal and other expenses (including legal fees and expenses of attorneys chosen by the Buyer Indemnitee) as and when incurred arising out of or based upon (*A*) subject to Section 8.1, any breach of any representation, warranty, covenant, or agreement of Seller or the Company contained in this Agreement ...

Section 8.2(a)(ii) provides for indemnity by the Seller in respect of claims by third parties. Section 8.2(b) sets forth the indemnity obligations of Polycast as Buyer.

Section 8.2(c) provides in pertinent part: *Defense of Claims.* No right to indemnification under this Section 8.2 shall be available to any Buyer Indemnitee or Seller Indemnitee (an "indemnified Party") unless such Indemnified Party shall have given to a person or persons obligated to provide indemnification to such Indemnified Party (an "Indemnitor") a notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder within 60 days after receipt of knowl-

edge of the facts upon which such claim is based (but the failure to so notify shall not relieve an Indemnitor from any liability he may have other than pursuant to this Section 8.2).

On December 10, 1986 Polycast gave Uniroyal written claim notice under Section 8.2(c). Polycast claimed breaches of the warranties contained in Sections 3.10 and 3.9.

As to Section 3.10, Polycast's claim notice said in part:

Seller states in the September 23, 1986 amendment included in the Agreement that actual earnings of the Company since December 29, 1985 through August 31, 1986 and projected earnings from September 1, 1986 through December 31, 1986 are currently estimated to aggregate approximately $13,300,000.

Actual earnings for the Company in 1986 will be materially less than $13,300,000. In addition, projected earnings for the Company in 1987 are materially less than the projections furnished by Seller to Buyer.

Polycast went on to ascribe these earnings reductions to a number of commercial factors, withheld from it by a responsible officer of Uniroyal. Polycast contends that these earnings reductions constitute a "material adverse change" within the ambit of Section 3.10.

As to Section 3.9, Polycast's claim notice said that there existed "material liabilities" not reflected or reserved against in the financial statements. Polycast listed those liabilities in Exhibit A to the claim notice. Exhibit A stated that Polycast's review of 1986 transactions revealed understated expenses and accruals at December 29, 1985 totalling $10,573,513. Exhibit A gave an itemized list. However, plaintiffs' brief on this motion at 122 abandons their warranty and indemnity claims with respect to the expenses and accruals listed on Exhibit A to the claim letter. Plaintiffs press warranty and indemnity claims for undisclosed and unreserved liabilities or obligations allegedly revealed by a subsequent audit of Plastics' October 31, 1986 financial statements.

To these warranty and indemnity claims, Uniroyal in its main and reply briefs makes several alternative arguments (not necessarily in the following order):

1. The SPA provides at least implicitly that after the closing, indemnification would be the exclusive remedy for breaches of warranty. Accordingly no "direct" breach of warranty action is allowed and the seventh claim must be dismissed.

2. Polycast's claim notice of December 10, 1986 does not give notice of the warranty and indemnity claims plaintiffs now assert.

3. Plaintiffs' direct claims for Section 3.9 and 3.10 breaches of warranty existing at the time of execution of the SPA are time barred because plaintiffs did not commence suit on them on or before December 10, 1986. (In making that argument, Uniroyal concedes that claims for indemnification arising out of Sections 3.9 and 3.10 breaches existing at the time of the SPA's execution were preserved by the December 10, 1986 claim letter).

4. Direct claims or indemnity claims relating to material liabilities (Section 3.9) or adverse changes (Section 3.10), arising after the execution of the SPA and known as of the closing, are time barred because such claims are governed by Section 3.19, and plaintiffs neither cancelled the contract nor sued upon the claims prior to the closing date of October 31, 1986.

5. In any event, the claims plaintiffs now assert, having been defined and refined by the discovery and motion process, do not fall within the Sections 3.9 and 3.10 warranties.

Uniroyal's first point is well taken, but makes no practical difference. While contract and tort law frequently speak of "indemnification" in the context of third-party liability, the SPA uses the word in a broader sense. Section 8.2(a)(ii) creates Uniroyal's obligation to indemnify Polycast in respect of "claims ... of persons not a party to this Agreement ..." Section 8.2(a)(i) imposes that obligation in respect of "claims ... arising out of or based upon ... any breach of any ... warranty ... of Seller of the Company contained in this Agreement ..." Thus we see that "Indemnity" is the word the parties applied to, *inter alia,* claims for breach of warranty. The seventh and eighth claims pleaded in the complaint are accordingly duplicitous. The distinction is technical, not substantive.

■ The timeliness of plaintiff's warranty and indemnity claims turns upon the SPA's provisions for survival of the warranties.

Section 8.1 begins with unambiguous intimations of mortality: "[a]ll representations and warranties contained in Articles [ ]3 shall not survive, but shall expire on the Closing and be of no further force or effect thereafter and subsequent to the Closing, no party shall have any liability to any other party with respect thereto ..." That language has about it the terrible finality and clarity of the Last Trump: except that, as lawyers will, they inserted the word "except" after the language and then drafted 14 more lines of text. The language pertinent to the present issue provides that the warranties in Sections 3.9 and 3.10 "shall survive until December 10, 1986," with the proviso that Buyer shall not be indemnified under Section 8.2 for breach of Sections 3.9 or 3.10 warranties unless a responsible officer of Uniroyal or Plastics "had knowledge of such breach as of the Closing Date and willfully withheld such knowledge from Buyer." In other words, the last lines of Section 8.1 grant warranty claims a stay of execution from the closing date to December 10, 1986.

Section 8(c) conditions the Buyer's right to indemnity under Section 8.2 upon the giving of a claim notice. Polycast gave Uniroyal a claim notice on December 10, 1986.

As for the warranty provisions themselves, I agree with Uniroyal that Sections 3.9 and 3.10 speak of conditions existing at the time of execution of the SPA. That establishes the *raison d'etre* of Section 3.19. It "brings forward" the Sections 3.9 and 3.10 warranties to the closing date. If Sections 3.9 and 3.10 extended by their own terms to the closing date, Sections 3.19 would have no office to perform.

At this point in its argument Uniroyal cries "Gotcha!" Because Section 3.19, in contrast to Section 8.1, contains no provision for a stay of execution beyond the closing date, warranty claims in respect of conditions arising after execution of the SPA must be sued upon (not just asserted) on or before the closing date. So runs Uniroyal's argument.

The argument is too clever by half, and I reject it. As Uniroyal points out, albeit for a different purpose, Article 8 contains the only provisions in the SPA dealing with the Buyer's remedies for breaches of warranty by the Seller. Giving the SPA a symmetrical reading which gives effect to all its provisions, the following scheme emerges. The warranties of Section 3.9 and 3.10 are brought forward to the closing date by Section 3.19. Accordingly those warranties were in full force and effect on the closing date, and extended to any conduct or circumstances arising between the execution date and the closing date. With those warranties firmly in place on the closing date, Section 8.1 goes on to provide that they survive until December 10, 1986. There was no need for Section 8.1 to refer to Section 3.19 in granting a stay of execution to the warranties until December 10, 1986. Section 3.19 had a limited office to perform. It brought the warranties forward to the closing date. At that point in time, Section 8.1 came into play and carried the warranties further forward to December 10, 1986. On that date Polycast gave the claim notice required by Section 8.2(c). Any other reading is strained, hypertechnical, and cannot be regarded as expressing the intent of the parties.

Uniroyal refers repeatedly in its brief to the "statute of limitations" expressed in the contract for asserting claims, but the SPA contains no explicit limitation upon the time within which suit must be filed. The limitation upon which Uniroyal relies arises, if at all, only from an interpretation of the contract which I reject for the reasons stated.

■ Accordingly the question becomes whether Polycast's December 10, 1986 letter embraces the claims which plaintiff now make. Uniroyal says it does not because a series of fraudulently exaggerated earnings forecasts (the "core" of plaintiffs' case) cannot be characterized as "undisclosed liabilities" under Section 3.9 or "material adverse changes" arising in the "ordinary course" of the business under Section 3.10. There is a surface appeal to this argument, but it does not justify summary dismissal of plaintiffs' contract claims. Summary judgment is not appropriate on plaintiffs' fraud claims, for the reasons stated *supra;* but plaintiffs should not suffer summary dismissal of their contract claims and be required to go to trial solely on tort theories. Contract and tort theories may interrelate. For example, defendants profess that they did not act fraudulently. At trial they may seek to justify the repeatedly lowered earnings projections by material adverse changes in the business which Uniroyal and Plastics did not disclose to Polycast, arguably in breach of the warranty. The Northrop contract is a case in point. It is common ground that Northrop cancelled its contract with Plastics prior to the closing, and that Uniroyal and Plastics did not tell Polycast of the cancellation. Arguably that cancellation constituted a "material adverse change in the business" of Plastics, as that phrase is used in Section 3.10. Certainly the appalled and horrified language with which Uniroyal's top officers described the possibility of a Northrop cancellation would support that argument. Uniroyal's position on this motion is that the loss of the Northrop contract was a blessing in disguise because it cost Plastics money. The briefs contain conflicting economic analyses of Byzantine complexity. Whether Plastics was making money or losing money on the Northrop contract poses a fact issue not appropriate for summary judgment. Depending on how the trial proof comes in, plaintiffs' contract claims may be subject to motion practice under Rule 50. But that is for a later day.

The conclusion I reach is that neither the seventh nor the eighth claims will be dismissed on summary judgment. The duplicitous nature of these contract claims can be

dealt with under Rule 50 or in appropriate jury instructions.

*Damages Issues*

Defendants include in their motion two arguments which in effect ask for rulings *in limine* limiting plaintiffs' damages in an event of a finding of liability.

■ First, defendants challenge Polycast's claim that it is entitled to recover as consequential damages the interest it has been paying on increasing rate notes ("IRNs") that it issued to finance a portion of the purchase price of Plastics. Second, defendants contend that plaintiffs' claim for punitive damages should be stricken.

The challenged item of consequential damages is embraced by the allegations in ¶ 4 of the complaint and in ¶ A of the prayers for relief, which begin on page 74 of the pleading. I gather from these portions of the pleading that plaintiffs seek to recover these particular damages under their first through third claims, which arise under the federal securities laws, and on the fifth claim, which is founded upon common law fraud.

The same test applies to both classes of fraud claims. Judge Friendly made that clear in *Zeller v. Bogue Electric Manufacturing Corp.*, 476 F.2d 795, 803 (2d Cir.), *cert. denied*, 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), where he wrote: "A plaintiff seeking consequential damages for fraud, at common law or under federal securities legislation, must establish the causal nexus with a good deal of certainty." At that point a footnote was dropped from the text which said: "We would see nothing wrong in a principle varying the required degree of certainty somewhat inversely with the depth of the fraud." Judge Friendly went on to say in text that "[s]ince consequential damages are an addition to or in lieu of what would ordinarily constitute a fair recovery," it was not appropriate to apply those "liberal principles" which courts use when "some liberality is required to enable an injured plaintiff to recover anything."

Polycast financed the purchase of Plastics through the issuance of debt securities.

$75 million of the debt securities issued took the form of IRNs whose interest rates increased quarterly. Polycast says that it engaged in that type of financing only because it contemplated refinancing the IRNs with bank financing soon after the closing. However, as the extent of Plastics' 1986 earnings shortfall began to be known to Polycast, and in turn disclosed by Polycast to the banks, the banks lost interest and Polycast was unable to obtain refinancing for the IRNs. There is evidence in the record from which the jury could find these assertions to be true.

In two securities fraud cases, the Second Circuit has rejected claims for consequential damages based upon interest charges incurred by the purchaser of securities. The first of these is *Chris–Craft Industries, Inc. v. Piper Aircraft Corp.*, 516 F.2d 172 (2d Cir.1975), *rev'd on other grounds*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). *Chris–Craft* involved a battle for control of the Piper Aircraft Corporation. Plaintiff Chris–Craft Industries, which acquired significant amounts of Piper stock, successfully claimed that it had been damaged as the result of defendants' violations of the federal securities laws. Having reached that conclusion on the merits, the Second Circuit remanded the case to the district court for the calculation of damages. Judge Pollack's damages decision on remand is reported at 384 F.Supp. 507 (S.D.N.Y.1974). Chris–Craft "requested that the interest charges it has borne on loans which financed its Piper investment be awarded to it as consequential damages." 384 F.Supp. at 526. Chris–Craft contended that it had been carrying a "locked-in" Piper investment since being reduced to a minority position. Judge Pollack concluded that there was no proof Chris–Craft had been "locked in" so that sale of its Piper stock had been impossible. He went on to say that "[t]he cost of the use of credit or margin to acquire stock is not a proper element of damage to a purchaser's interest," and that "[c]onsequential damages are awarded only upon a clear showing of causal connection with the misconduct and the consequence claimed," citing *Zeller*. Judge Pollack rejected the

claim. The Second Circuit affirmed, also citing *Zeller.* 516 F.2d at 191–92. The Second Circuit said:

> Absent any showing of an actual, albeit futile, attempt by CCI to sell its holdings, we find it difficult to find a "causal nexus" between its interest payments and BPC's violations "with a good deal of certainty." We affirm the district court's refusal to award such interest expense.

In *Bennett v. United States Trust Co. of New York,* 770 F.2d 308 (2d Cir.1985), the plaintiffs claimed that U.S. Trust knowingly or recklessly misrepresented to them that the Federal Reserve's margin rules did not apply to public utility stock deposited with a bank as collateral. Relying on that misrepresentation plaintiffs borrowed money from U.S. Trust to purchase public utility stock, depositing the stock with U.S. Trust as collateral. Over time the dividends generated by the stock proved insufficient to cover the interest expenses on the loans; the outstanding principal and interest on the loans increased; the market value of the stock decreased; and U.S. Trust liquidated plaintiff's account. Plaintiffs wound up losing their equity in the $1 million in public utility stock deposited in U.S. Trust, and also owed U.S. Trust $1.2 million on the loans.

Plaintiffs sued U.S. Trust on a number of federal and state law theories, including section 10(b) and Rule 10(b)–5. The Second Circuit affirmed the district court's dismissal of the securities fraud claim because plaintiffs "failed to establish loss causation between the alleged misrepresentation and the plaintiffs' own unwise investment decisions," 770 F.2d at 314. At that point in text the Second Circuit dropped a footnote disposing of the plaintiffs' alternative claim, for the loss resulting from the interest charges which they had to pay on the loans from U.S. Trust. The court of appeals said at 314 n. 1:

> The Bennetts also argue that even if we hold that the misrepresentation did not cause the loss resulting from the decline in the stock's value, they should still be entitled to recover the loss resulting

from the interest charges. We find this argument unconvincing. U.S. Trust is not alleged to have made any misrepresentation with respect to the loans; the Bennetts received the money that they sought, for the purpose desired, and under conditions that they understood and found agreeable. The interest expense would have been the same no matter how the Bennetts used the loan proceeds. Thus, we cannot accept the complaint's characterization of the interest expense as an element of damages.

A comparable concept of loss transaction is reflected in *Monetary Management Group v. Kidder Peabody & Co.,* 615 F.Supp. 1217 (D.C.Mo.1985). A management adviser brought an action against a brokerage firm alleging that the firm agreed to provide marginable bonds and that two sets of bonds plaintiff purchased were not marginable in accordance with federal reserve regulations. Plaintiff asserted that the brokerage firm's misrepresentation violated section 12(2) of the Securities Act of 1933, and also alleged violation of state law and common-law misrepresentation. The district court found a violation of section 12(2). In calculating damages, the court rejected plaintiff's request for return of the interest charges associated with the bonds in question, stating at 1223:

> Defendants' objection is well-taken. The interest charges in question were incurred by MMG, because Kidder, Peabody in fact margined the bonds in question. During the period of time that MMG had an account with Kidder, Peabody, MMG received exactly what it bargained for, namely, marginable bonds or an investment on credit. In this regard, Kidder Peabody and Martin did not make any misrepresentations with respect to what MMG was receiving for its interest payments.

Plaintiffs say that *Chris–Craft* is distinguishable and rely upon *Minpeco, S.A. v. Hunt,* 686 F.Supp. 420 (S.D.N.Y.1988). That was an antitrust case in which defendants manipulated the silver market. As the result of defendants manipulation plaintiffs, who held short positions in the market, were forced to borrow money "which

was required to meet margin calls and close silver futures and forward positions." *Id.* at 425. Judge Lasker held that the interest plaintiffs paid on those borrowed funds was properly claimable as damages stemming from defendants' antitrust violation. He rejected defendants' argument that the interest claim was the legal equivalent of a claim for prejudgment interest, a concept defendants urged because "prejudgment interest is granted only sparingly in antitrust actions, it can only be calculated that the close of trial after damages, if any, have been established, and it may not be included for the purposes of trebling damages." *Id.* at 426. Judge Lasker rejected the analogy to prejudgment interest and allowed the claim, denying defendants' *in limine* motion to preclude it.

In *Freschi v. Grand Coal Venture,* 588 F.Supp. 1257 (S.D.N.Y.1984), plaintiff invested in a limited partnership as a tax shelter. Defendants were held liable to him for violation of section 10(b) of the 1934 Act and state law fraud. Plaintiff claimed as an item of damages an interest penalty assessed by the IRS after its disallowance of plaintiff's tax deductions. Judge Sweet denied the claim, reasoning that plaintiff's use of the unpaid tax money prior to the IRS assessment approximately equalled the interest penalty. Judge Sweet said: "Accordingly, Freschi has failed to meet the heavy burden a Rule 10b–5 plaintiff faces in attempting to prove consequential damages, *see Zeller, supra,* and an award for the interest penalty is impermissible." 588 F.Supp. at 1260.

None of these cases is squarely on point. But I think that defendants have the better of the argument. *Chris–Craft* stands for the proposition that a section 10(b) plaintiff claiming consequential damages bears the heavy burden of establishing a causal nexus "with a good deal of certainty." Plaintiffs at bar say they have done so: "Because plaintiffs overpaid by $50 million, they had to issue an extra $50 million of IRNs. Because they issued an extra $50 million of IRNs they have had to pay interest on them." Brief at 134. That may satisfy transaction causation, but more recent authority illustrated by *Bennett* requires loss causation as well, and there is no suggestion that defendants' misrepresentations played a direct part in the form or conditions of the debt Polycast incurred, or that Polycast did not obtain what it bargained for in borrowing the money.

I conclude that defendants' objection to this item of damages is well taken.

 I deny defendant's motion to strike plaintiffs' claim for punitive damages. Punitive damages are not recoverable in a section 10(b) action, but may be recovered under pendent state claims. *See Meyers v. Moody,* 693 F.2d 1196, 1220 (5th Cir.1982), *reh'g denied,* 701 F.2d 173, *cert. denied,* 464 U.S. 920, 104 S.Ct. 287, 78 L.Ed.2d 264 (1983). Plaintiffs at bar assert state and common law claims against defendants for fraud. Under New York law, which governs, "punitive damages may be awarded when fraud is gross, wanton or willful, whether or not directed at the public generally." *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 649 (2d Cir.1989) citing New York cases. *See also Roy Export Co. Establishment of Vaduz v. CBS, Inc.,* 672 F.2d 1095, 1106 (2d Cir.) ("New York law clearly permits punitive damages where a wrong is aggravated by recklessness or willfulness"), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). In *Ostano* the court of appeals confirmed an award of punitive damages on the basis of the district court's finding that defendant "entered this transaction from the outset with a clear and blatant intent to defraud." 880 F.2d at 646.

In the case at bar, plaintiffs allege that defendants deliberately exaggerated Plastics' projected earnings, thereby manifesting "a clear and blatant intent to defraud." That intent was implemented most recently, plaintiffs argue, when Polycast renounced the SPA because of the reduced earnings forecasts, only to be lured back to the negotiating table with assurances of the accuracy of the September 5, 1986 $13.3 million projection. There is evidence in the record which would permit, although it would not require, the jury to conclude that at least certain defendants engaged in

"gross, wanton or willful" fraud. Accordingly I deny the motion to strike the claim for punitive damages.

### Conclusion

For the foregoing reasons, defendants' motion for summary judgment dismissing plaintiffs' fourth claim under the RICO statute is granted. There being no just reason for delay, the Clerk of the Court is directed to enter judgment dismissing that claim. *See* Rule 54(b), Fed.R.Civ.P.

As required by the Second Circuit authority, *see, e.g., National Bank Washington v. Dolgov*, 853 F.2d 57 (2d Cir.1988), I state my reasons for certifying a judgment dismissing plaintiffs' RICO claim at this time.

Whether or not plaintiffs can satisfy the continuity requirement of the RICO claim poses a discrete question which is capable of resolution on the present record. Whether or not trebled damages are available to plaintiffs if they prevail on the merits is a question of considerable importance to all parties. An appellate ruling on the issue in advance of trial may enhance settlement negotiations.

If the parties decline to negotiate or nothing comes of settlement efforts, then the alternative to a Rule 54(b) certification on the RICO question at this time is to send the case to trial with the question unresolved at the appellate level. For the reasons stated in this Opinion, I do not think plaintiffs state a viable RICO claim. Accordingly I will not submit that claim to the jury. If my judgment on the issue is reversed by the court of appeals after what is sure to be a protracted trial, then the case will have to be tried again with the RICO claim reinstated.

There are accordingly compelling reasons of practicality and expediency for certifying a judgment under Rule 54(b) dismissing plaintiffs' RICO claim under Rule 54(b). There is recent Second Circuit authority for doing so. *See Cullen v. Margiotta*, 811 F.2d 698, 712–13 (2d Cir.1987).

Defendants' motion for summary judgment is in all other respects denied.

It is SO ORDERED.